**Adelbert M. BRYAN, Appellant,**

v.

**GOVERNMENT OF THE VIRGIN ISLANDS, Appellee.**

**D.C. CRIM. APP. No. 1998–171.**

District Court, Virgin Islands,
Appellate Division,
D. St. Thomas and St. John.

Considered: May 25, 2000.

Filed: June 13, 2001.

Joel H. Holt, St. Croix, VI, for Appellant.

Joel H. Feld, Assistant Attorney General, St. Thomas, VI, for Appellee.

Before: RAYMOND L. FINCH, Chief Judge of the District Court of the Virgin Islands; THOMAS K. MOORE, Judge of the District Court of the Virgin Islands; and ALPHONSO G. ANDREWS, JR., Territorial Court Judge, Division of St. Croix, Sitting by Designation.[1]

**OPINION OF THE COURT**

PER CURIAM.

The day following the November 6, 1996 general elections in the Virgin Islands, the Honorable Adelbert M. Bryan, Virgin Islands Senator ["Bryan" or "appellant"], had an altercation with Steven V. Rockstein ["Rockstein"], a Daily News photographer, on the Senate Floor. Bryan complained that Rockstein was unnecessarily taking numerous photos of him. The Sargent-at-arms requested Rockstein to cease taking pictures of Bryan, but Rockstein refused. Bryan then grabbed Rockstein's camera and threw it to the floor. Thereafter, the Government of the Virgin Islands ["government" or "appellee"] charged Bryan with destruction of property and simple assault in the Territorial Court. After a bench trial, the Territorial Court convicted Bryan of destruction of property and acquitted him of simple assault. Senator Bryan now appeals his conviction. The precise issue presented on appeal is:

Whether the Trial Court's finding, beyond a reasonable doubt, that Bryan injured or damaged a camera belonging to the Daily News was clearly erroneous.

We hold that the trial court's finding was not clearly erroneous and thus will affirm Bryan's conviction.

**I. PROCEDURAL BACKGROUND**

On May 16, 1997, the Attorney General of the Virgin Islands filed a two-count complaint in the Territorial Court against Senator Bryan charging him with destruction of property (Count 1) and simple assault (Count 2). The Territorial Court held a bench trial on both charges on January 29, 1998. In an order dated February 13, 1998, the Honorable Ive Arlington Swan, Territorial Court judge, found Bryan guilty of destruction of property and not guilty of simple assault. On February 25, 1998, Bryan filed a motion for judgment of acquittal or new trial. By order dated June 24, 1998, Judge Swan denied Bryan's motion. On June 25, 1998, he sentenced Bryan to ninety (90) days of probation plus a fine of two hundred dollars ($200.00), with seventy-five dollars ($75.00) suspended. Judge Swan also required Bryan to pay restitution in the amount of three hundred fifty dollars ($350.00). Judgment was entered on July 18, 1998. This appeal followed.

**II. FACTS**

On November 7, 1996, the Twenty–First Legislature of the Virgin Islands was in session. Senator Adelbert M. Bryan was present and commenced his comments on the legislative subject under discussion. Steve Rockstein, a Daily News photographer, aimed his camera at Bryan and be-

---

1. Judge Andrews is no longer a Territorial Court judge at the time this decision is issued.

We note that Judge Andrews was inclined to reverse the conviction.

gan taking pictures. Evidence in the record indicates that Rockstein's photo taking involved an incessant and unrelenting "clicking" and "flashing" of his camera in rapid succession. Bryan protested to Rockstein for him to cease taking his picture and threatened that if Rockstein did not stop, he was "coming for the camera." Rockstein ignored Bryan's plea. Bryan then complained to Senate President Almando Liburd ["Liburd"]. Eventually, Liburd directed the Sargent-at-arms, Albion Lambertis ["Lambertis"], to request Rockstein to stop his picture taking as a "favor to the Senate President."

Lambertis approached Rockstein and gave him Senator Liburd's message. Rockstein insisted that he had a right to take photos and continued to follow Bryan while "clicking" and "flashing" his camera. Senator Bryan then approached Rockstein and in an angry manner grabbed his camera and hauled it to the floor, damaging it and causing the flash to separate.

The government charged Senator Bryan in Count 1 with "maliciously injur[ing] or destroy[ing] personal property not his own and belonging to the Daily News, to wit: a camera, in violation of 14 VIC Section 1266." (App. at 1.) The camera, a Nikon FM-2, was admitted into evidence as government exhibit G-3 ["exhibit G-3"].[2] Rockstein testified that exhibit G-3, which was visibly damaged, was the camera which Bryan grabbed and threw to the floor. The record also established that Nikon FM-2 cameras do not automatically advance the film in rapid succession (i.e., 2½ to 5 frames per second) unless modified with a winder or motor drive. (App. at 388, 446, 451 (Testimonies of H. Hodge and E. Bardrof).) Such a winder or motor drive would attach at the base of the camera.[3] (App. at 345, 447 (Testimonies of E. Bardrof and M. Jackson).) Senate President Liburd and Sargent-at-arms Lambertis, however, both testified that Rockstein's camera took Senator Bryan's photographs in rapid succession and that they heard continuous rapid clicks.[4] M. Thomas Jackson, Bryan's expert photographer, testified that when a winder is attached to an FM-2 camera, "You hear the same type of wounding [sic] or click work" as with a motor drive. (App. at 464-65.) Lambertis also testified that Rockstein's camera had an extra attachment at the bottom to increase the revolution of the film. (App. at 229-30.) Samuel Daly, the Senate's photographer, testified that Rockstein had two cameras and used a Nikon F4 camera to take Bryan's photographs. (App. at 312.) The Nikon F4s have a built-in motor drive. (App. at 312.) Consistent with this testimony, the trial court found that Rockstein had such a camera. In its order adjudging Bryan guilty of destruction of property, the trial court stated:

Rockstein's activities included an incessant and unrelenting "clicking" and "flashing" of his camera in rapid succession, while simultaneously targeting

---

**2.** Rockstein, William A. Curtis, Jr., and M. Thomas Jackson all testified that exhibit G-3 was a Nikon FM-2 camera. (App. at 103-04, 273-74, 340.)

**3.** Exhibit G-3 as it appeared in court did not have a winder or motor drive attached to it.

**4.** Senator Liburd testified that the clicking was unusual because it was in rapid succession. (App. at 183.) He further testified, "it was click, click, click, click, click, click, click, click, rapidly like that. It was in rapid succession.... I could hear the clicking from where I was up there in my seat." (App. at 185.) Lambertis described Rockstein's picture taking as, "like it go click, click, click, like repetitious, real real fast .... I can't tell you how fast the motor drive or whatever the attorney said operates, but I know he was taking pictures not like regular, one-, one-, one-it was repetitious." (App. at 230-31.)

Bryan as the sole object of his photo session.

The nomenclature of Rockstein's camera, and whatever additional mechanism that was mounted upon the camera, allowed Rockstein to continue to take Bryan's photograph in unremitting succession. As Bryan continued speaking on the floor of the Legislature, Rockstein continued his disturbing, distracting, and unending cadence of "clicks" and "flashes".

*Government of the Virgin Islands v. Bryan*, Crim. No. 184/97, (Terr. Ct. St. T. and St. J. Feb. 13, 1998) (order adjudging defendant guilty at 2–3). Rockstein himself, however, testified that he had no motor drive attached to his camera when he took Bryan's photographs. (App. at 427.) He did not deny, however, that a winder was attached.[5]

Eric Bardrof, the government's expert witness, testified that an examination of the negatives taken by Rockstein suggest that they were not taken with a motor drive since they were not evenly spaced. (App.451–52.) Bryan's expert, M. Thomas Jackson, testified that it is difficult to obtain consistently spaced negatives, even with a motor drive, and consequently a more accurate determination can be made by examining the photographs themselves. Such an examination, he stated, revealed that the photos taken by Rockstein are consistent with photos taken with either a winder *or* motor drive. (*Id.* at 462–64.)

The government's expert, Eric Bardrof, on direct examination explained why the damage present on exhibit G–3 would not have occurred if Rockstein's camera had been equipped with a winder or motor drive:

That socket [on exhibit G–3] is also used to hold a motor drive or a winder, either one of them; and in this case, a winder, to the base of the camera. If that was screwed into this whole [sic], then there's no possible way this base could be peeled away from it such as it is .... And there's no damage to the threads inside it, and literally, if a motor drive was on here, the motor drive would have taken the brunt of the damage rather than the base of the camera which is very deformed at this point.

So, if there was a motor if there was a motor drive, it would have been damaged, and on this particular camera there absolutely was not a motor drive on here, because it would have prevented all of this damage on the base from taking place. It would have happened to the motor drive and not the base.

(App. at 447.) On cross-examination, Bardrof again conceded that if a motor drive was on exhibit G–3 one would not see the visible damage present on it. (App. at 454.) He also conceded that the damage to exhibit G–3 could have been caused by someone striking or pounding the camera after the incident. (App. at 453–54.)

The trial court resolved the issue of whether the wrong camera was introduced into evidence by finding that: 1) Rockstein had two cameras on November 7, 1996, i.e., the Nikon FM–2 (exhibit G–3) and a Nikon F4; and 2) Rockstein may have been observed clicking in rapid succession with the Nikon F4 *after* the incident with Bryan. The court then concluded that Bryan damaged the Nikon FM–2 admitted into evidence. *See Government of the Virgin Islands v. Bryan*, Crim. No. 184/97, (Terr. Ct. St. T. and St. J. June 24, 1998) (order denying motion for acquittal p. 6).

5. This distinction is important since both photography experts testified that the Nikon FM-2 camera takes a winder, not a motor drive. (App.446, 463.)

Several witnesses, aside from Rockstein, testified that Bryan "threw" or "smashed" Rockstein's camera to the floor. Ron Dillman and Adriane J. Dudley testified that they observed damage to exhibit G–3 on November 7, 1996. They did not witness the incident, however, nor see the camera immediately after the incident. Consequently they ·did not testify about the cause of the damage or whether exhibit G–3 was the camera Bryan threw to the floor.

The government's expert, M. Jackson, testified that the falling of the camera could have caused some damage. (App. at 381.) Rockstein testified that the camera was damaged as a result of Bryan's throwing it to the floor. (App. at 91.) He explained that upon impact, the flash separated from the camera, and that the lens and flash were damaged. (App. at 91–92.) Rockstein later clarified that the damage to the lens was internal, not external:

Q. Are you surprised that the lens in this case has no damage on it?

A. Well, we don't know that it has no damage. There's no—we're not certain if the diaphragm works or if the focussing works.

Q. But there are no scratches or any other marking on the lens, aren't there?

A. May I look?

Q. Sure.

A. The lens does not appear to be broken, yes, I'm not surprised because of the way it hit actually.

(App. at 429.) M. Jackson testified that the lens is one of the most fragile items on a camera, but that there was no visible damage to it. (App. at 346–47.)

The trial court found that the damage was caused by Bryan's throwing the camera to the floor. In reaching this finding the trial court stated in pertinent part:

The eye-witnesses for both sides, including Bryan, testified that Bryan removed Rockstein's camera from around his neck and threw it to the floor of the Legislature, as both men confronted each other in the Senate Gallery. . . . The camera, which was admitted in evidence, sustained graphic signs of injury.

The camera has a large crack. The camera's lens does not work properly since the incident. Additionally, there are other signs of disfigurement easily visible upon inspection of the camera and which the Court finds are attributed to Bryan's actions . . . .

The unavoidable conclusion is that the camera sustained injuries. Therefore, this Court has no hesitancy or compunction in finding that the camera was injured or damaged as a direct and proximate result of it being propelled upon the Senate Floor by Bryan.

*Government of the Virgin Islands v. Bryan,* Crim. No. 184/97 (Terr. Ct. St. T. and St. J. Feb. 13, 1998) (order adjudging defendant guilty at 10–12). In its order denying Bryan's motion for acquittal, the trial court further stated:

It is undeniable that the damages to the camera are consistent with the defendant's actions. The Government's expert, Eric Barndorf [sic], stated that the damages on the camera are consistent with someone smashing the camera to the floor of the legislature. The Government's expert was unequivocal that the damage on the camera is likewise consistent with a downward movement and consistent with a single blow to the camera.

*Id.,* June 24, 1998 (order denying motion for acquittal p. 7).

### III. LEGAL ANALYSIS

Senator Bryan contends that the trial court erred when it found that he injured or damaged a camera belonging to the Daily News and subsequently convicted him of destruction of property. He maintains that the government's exhibit G–3, the camera admitted into evidence, was

not the camera he threw to the Senate floor. The government responds that the trial judge's ruling was not clearly erroneous.[6] As explained below, we agree with the government that the trial court's finding was not clearly erroneous.

## A. Applicable Standard of Review: Clearly Erroneous

 The applicable test for reviewing factfinding in a non-jury criminal case is the clearly erroneous rule. *See United States v. Stassi*, 583 F.2d 122, 126 (3d Cir.1978); *United States v. Delerme*, 457 F.2d 156, 160 (3d Cir.1972). Where the evidence consists largely of contradictory oral evidence, due regard must be accorded the trial court's opportunity to judge the credibility of witnesses. *See Delerme*, 457 F.2d at 160. Further, where two permissible views of the evidence exist, the trial court's choice between them cannot be clearly erroneous. *See Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 147 (3d Cir.1999). This standard "turns on the quantum of evidence on the record: a mere scintilla will not suffice; the evidence must rise to at least that degree which reasonable minds might accept to support a conclusion." *Delerme*, 457 F.2d at 160. The reviewing court may not substitute findings it would have made as factfinder. *See Krasnov v. Dinan*, 465 F.2d 1298, 1302 (3d Cir.1972). Its function is to first examine all the evidence. *See Evans*, 166 F.3d at 147. Thereafter, it may reject a trial court's factual findings, although there is evidence to support it, only if it is "left with a definite and firm conviction that a mistake has been committed." *Concrete Pipe & Prods. v. Const. Laborers Pension Trust*, 508 U.S. 602, 113 S.Ct. 2264, 2279, 124 L.Ed.2d 539 (1993) (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)); *Evans*, 166 F.3d at 147; *In re General Motors Corp. Pick–Up Truck Fuel Tank*, 55 F.3d 768, 783 (3d Cir.1995). The rule thus represents a degree of certainty, in the mind of the reviewing court, "that a factfinder in the first instance made a mistake in concluding that a fact had been proven under the applicable standard of proof." [7] *Concrete Pipe*, 113 S.Ct. at 2279.

 With these principles in mind, we now decide the precise issue before us, to wit, whether the trial court's finding, beyond a reasonable doubt, that Bryan injured or damaged a camera belonging to the Daily News, was clearly erroneous. In order to obtain a conviction on count one, the government had to prove beyond a reasonable doubt that: 1) Bryan injured or destroyed personal property, to wit, a camera; 2) the property did not belong to Bryan; and 3) Bryan acted maliciously. *See* 14 V.I.C. § 1266. The focus of this appeal is the trial court's finding that the government proved the first element.

## B. The Trial Court's Finding that Steve Rockstein Was Credible Was Not Clearly Erroneous.

 Bryan attacks the credibility of Rockstein's testimony that Bryan injured

---

6. The government also argues that the trial court did not abuse its discretion in admitting exhibit G–3 into evidence. Bryan, however, does not challenge the admission of the camera into evidence, but rather the weight accorded it. (*See* Brief of Appellant at 15.) The government's abuse of discretion argument is thus a non-issue in this appeal.

7. As this is a criminal case, the applicable standard of proof is reasonable doubt. A trial court's factual findings are considered clearly erroneous if: 1) they are unsupported by substantial evidence; 2) they lack adequate evidentiary support in the record; 3) they are against the clear weight of the evidence; or 4) the trial court has misapprehended the weight of the evidence. *See Davin v. U.S. Dept. of Justice*, 60 F.3d 1043, 1049 (3d Cir.1995).

his camera. Senator Bryan asserts that Rockstein contradicted himself when he testified about the condition of the camera's lens. On direct examination by the government, Rockstein stated that "[t]he view finder was smashed and it was just—the lens, the mirror and the shutter were locked. They were broken and just stuck in the open position." (App. at 91.) Later on cross examination as a rebuttal witness, Rockstein stated "we're not certain if the diaphragm works or if the focussing works . . . [t]he lens does not appear to be broken." (*Id.* at 429.)

We defer to the trial judge's implicit finding that Rockstein spoke credibly about the damage to the camera, since a review of his testimony does not allow us to come to a definite and firm conviction that Rockstein impeached himself as Bryan has suggested. With respect to his first statement, the trial judge listening to Rockstein's testimony and observing his demeanor was entitled to conclude that he was referring to the lens in the view finder assembly. This assembly includes its own lens through which the photographer views what the camera "sees" with the aid of a mirror, which flips out of the way when the shutter button is depressed. Further, the trial judge was entitled to understand that Rockstein, when he said the view finder assembly was smashed and broken, referred not to visible physical damage, but to damage that affected the functionality of the camera, since Rockstein stated in the same breath that "the lens, the mirror and the shutter were *locked* . . . . just *stuck* in the open position." (App. at 91 (emphasis added).) Similarly, the trial judge could reasonably have taken Rockstein's later testimony that the lens, meaning the main camera lens, did not appear to be broken as responsive to a question about its *physical appearance,* rather than the functionality of the camera: "But there are no scratches

or any other marking on the lens, aren't there?" (*Id.* at 429.)

Given these reasonable and permissible interpretations of Rockstein's testimony, we cannot find that Rockstein contradicted or impeached himself. *See Concrete Pipe and Products v. Const. Laborers Pension Trust,* 508 U.S. 602, 113 S.Ct. 2264, 2279, 124 L.Ed.2d 539 (1993). The fact that we, as the reviewing court, cannot determine for certain from the record which lens Rockstein was talking about at any given moment and that more than one permissible view of the evidence exists requires that this Court defer to the trial court's acceptance of Rockstein's testimony as credible. *See Durham Life Ins. Co.* at 147. Accordingly, we defer to the trial judge's finding beyond a reasonable doubt that Rockstein was credible.

**C. Witness Testimony Corroborates Rockstein's Testimony that Bryan Damaged a Camera.**

 Rockstein's sworn testimony that Senator Bryan damaged or injured his camera by ripping it from around his neck and smashing it to the floor was sufficient by itself to justify the trial court's conclusion that Bryan damaged a camera belonging to another. Further, testimony wholly independent of Rockstein's testimony corroborates Rockstein's version of events and establishes the first element the government was required to show, that Bryan damaged a camera not belonging to him.

The expert testimony of Eric Bardrof that the damage to exhibit G–3 was consistent with someone smashing the camera to the floor of the Legislature, and that his examination of the negatives developed from the film in the camera when it was thrown to the floor indicated a motor drive or winder was not used. Mr. Bardrof's

testimony corroborated Rockstein's version of events by explaining how exhibit G–3 could have sustained the damage it did by being "propelled downward quite significantly" and landing a certain way. (*See* App. at 442.) He accounted for the separation of the camera casing as the result of the continuing forward momentum of the heavier part of the camera after the lighter base of the camera had stopped moving. (*See id.* at 443.) His account provided an alternative to the explanation given by defendant's experts that the camera had been pried open. Bardrof observed no signs of prying, "no tool marks, ... no scratches in the paint ... [or] on the actual pieces of metal...." (*Id.* at 444.) Bardrof's testimony corroborated the testimony of nearly all the eyewitnesses, including defendant himself, that the camera was "smashed down," or in Bardrof's words, suffered "one big massive hit." (*See id.* at 445.) Further, stress marks on the negative containing images of Bryan were consistent with the damage to exhibit G–3 itself, thereby confirming that exhibit G–3 was the camera involved in the incident. (*See id.* at 448–50.)

Bardrof also corroborated Rockstein's testimony that "the shutter [was] ... stuck in the open position" as a result of Bryan slamming the camera down, (*see id.* at 91), by matching an exposed frame of the negative with the jammed shutter of exhibit G–3. (*See id.* at 450). Responding to the controversy regarding the presence or absence of a motor drive on the camera, Bardrof opined that the condition of the socket where the drive would have been attached and the variability of the spacing between the negatives corroborated Rockstein's testimony that he didn't have a motor driven winder on the camera. (*See id.* at 446–47, 451–52.) Bardrof further noted that "some people have a quick thumb." (*See id.* at 451.) The government's expert summarized that the conditions of negative, the camera, and the flash (Exs. G–2, G–3, and G–4) "are all very consistent with a single strike to the camera." (*See id.* at 451.) The trial court, thus presented with more than one permissible view of the evidence, appropriately selected the corroborating testimony of Bardrof and Rockstein.

▮▮▮▮ The finder of fact is permitted to draw reasonable inferences from the evidence before it, including circumstantial evidence which is afforded weight equal to direct evidence in our system of jurisprudence. Thus, the trial judge properly inferred from the undisputed testimony of Bryan smashing the camera to the floor that the blow caused some injury to the camera. The testimony was overwhelming and unanimous that Bryan did not just "throw" the camera down, but he "smashed" it down to the ground.[9] Even

---

9. More than a half dozen witnesses testified that Bryan took a camera from Rockstein and threw it to the floor. Rockstein testified that Bryan "grabbed the camera, yanked it off my neck, held in over his head with two hands, stared directly at me and threw it to the floor." (App. at 87.) Senator Liburd, who witnessed the incident, testified, "I saw Senator Bryan had his hand up with something in his hand, and he smashed it to the floor. At this time I realized it was a camera, and it had just smashed, and that was it." (*Id.* at 176.) Police Officer Carlton Charleswell testified that Senator Bryan told him that "they got into a confrontation and he took the camera and smash it." (*Id.* at 200.) Albion Lambertis, the Sargent-at-arms, testified that he saw Senator Bryan "throw [the camera] on the ground. He didn't fling it on the ground, he throw it on the ground." (*Id.* at 225.) Senator-elect Frett, an eyewitness to the incident, testified *for the defense* that Bryan "grabbed the camera with both hands and jerked it from his neck and smashed it to the ground ...." (*Id.* at 291.) Another defense eyewitness, Charles Frazer, Sr., testified that "Senator Bryan left where he was and went to [Rockstein] and took the camera from him

Bryan admitted that he grabbed the camera and "just dash it" on the rug. (App. at 401.) In addition, the Legislature's Sargent-at-arms agreed that the impact had injured the camera: "I think Steve [Rockstein] had left with the damaged camera." (*Id.* at 228.) Even one of defendant's experts, M. Thomas Jackson, agreed that the kind of impact caused by Senator Bryan smashing the camera to the floor could have damaged it, though not, in his opinion, to the extent shown on the camera in evidence. (*Id.* at 381–82.)[10] Accordingly, there was sufficient evidence for the finder of fact to determine that Bryan damaged the camera that he snatched from Rockstein's neck. As long as the inference was reasonable, as it was in this case, a reviewing court may not substitute its own judgment through a contrary inference. *See Government of the Virgin Islands v. De Olivera*, 8 V.I. 602, 604 (D.V.I.1971) (no error where trial court credited eyewitness testimony and reasonably inferred therefrom beyond reasonable doubt that defendant committed act alleged).

Bryan's argument that the camera admitted into evidence was not the camera that Bryan smashed to the floor is a red herring. The government's burden of proving injury to a camera was complete once the factfinder, Judge Ive Arlington Swan, found beyond a reasonable doubt that there was credible testimony of such injury based on reasonable inferences from circumstantial evidence of such injury.

and throw it on the floor." (*Id.* at 300.) Another defense witness, Samuel Day, testified in almost the identical words. (*Id.* at 311.) And appellant himself testified that "when I grabbed the camera, he held the strap and I smashed it with one motion." (*Id.* at 420.)

10. The trial court correctly focused on whether *any* damage had been caused to the camera that Rockstein had with him on the day of the incident:

Since the other two elements of the crime are undisputed, the government made its case and there is no grounds for reversal.

## IV. CONCLUSION

Our review of the entire record leaves us with no impression, much less a definite and firm conviction, that the trial judge erred when he found that the government proved, beyond a reasonable doubt, that Bryan injured or damaged a camera belonging to the Daily News. The trial judge's finding is thus not clearly erroneous. Accordingly, we will affirm the trial court's conviction.

THE COURT: Could the falling of that camera, could it have caused any damage at all to that camera?
WITNESS JACKSON: Yes, Your Honor.
THE COURT: But none of the damage that's there.
WITNESS JACKSON: Definitely not that type of damage. Anything could happen. You can bump a camera against the wall and it could lock the shutter or jam the back. . . .
(App. at 381–82.)