**Eugene WILLIAMS, Appellant,**

v.

**GOVERNMENT OF THE VIRGIN ISLANDS, Appellee.**

**Nos. CR.A.2002/34, 39/2001.**

District Court, Virgin Islands,
D. St. Croix,
Appellate Division.

May 30, 2003.

Martial A. Webster, St. Croix, VI, for Appellant.

Maureen Phelan, V.I. Department of Justice, for Appellee.

Before: RAYMOND L. FINCH, Chief Judge, District Court of the Virgin Islands; THOMAS K. MOORE, Judge of the District Court of the Virgin Islands; and BRENDA J. HOLLAR, Judge of the Territorial Court, Sitting by Designation.

## MEMORANDUM OPINION

PER CURIAM.

Following a trial by jury, Eugene Williams ("Williams", "Appellant") was convicted of unlawful sexual contact first degree and two counts of child abuse, stemming from charges he sexually abused his two minor stepdaughters. Williams now challenges his conviction and raises the following issues on appeal:

1. Whether the trial court erred in admitting out-of-court statements of the two minor victims;

2. Whether expert testimony was improperly admitted without prior notice;

3. Whether the defendant was prevented from conducting full cross-examination of a physician who testified on the fact of the abuse;

4. Whether the trial court erred in permitting the government to call and repeatedly question the victims' mother before the jury, after she had invoked her Fifth Amendment right against self-incrimination;

5. Whether the court erred in denying appellant's motion for judgment of acquittal, based on an alleged *Brady* violation;

6. Whether the trial court displayed bias toward the defense, resulting in a denial of appellant's right to a fair and impartial trial; and whether there were cumulative trial errors which resulted in an unfair trial.

7. Whether the evidence was sufficient to support conviction.

For the reasons more fully stated below, the appellant's conviction will be reversed.

## I. STATEMENT OF THE FACTS

In 1999, M.H. and K.J., then 11 and 8 years old, respectively, reported to their mother, Beverly Edney ("Edney") that

they were being sexually abused by their stepfather. The girls reported the abuse began shortly after Williams and their mother were married in 1995. [Supplemental Appendix ("Supp.App.") at 110,183, 261, 214]. At the time the abuse began, the girls were approximately seven and five years old. Both girls reported similar experiences. They said Williams had fondled their vaginas and breasts, and had inserted his penis slightly into their vaginas, but had stopped after another sibling entered the room in each instance. [Supp. App. at 164–68, 219, 100–09]. In response to this revelation, Edney assured her daughters that she would observe the situation, which she did for a year. [Supp. App. at 110]. M.H. reported the abuse stopped during that time. Finally, after a year had passed, Edney reportedly told the children they were not to be believed. [Supp.App. at 109–110]. In September, 2000, approximately one year after the girls had reported the abuse to their mother, Edney took them to reveal that information to M.H.'s biological father, Michael Henry ("Henry"), who urged Edney to take the children to a doctor. [Supp.App. at 180–87]. Subsequently, after learning the children had not been taken to a doctor as agreed, Henry contacted the Department of Human Services ("DHS"), and this prosecution was set into motion.

As a result of the reports to DHS, the children were taken to Dr. Mavis Matthew ("Dr.Matthew"), who performed the initial physical examination and concluded neither girl had an intact hymen. [Supp.App. at 263–273]. Accompanying the girls to Matthew's office were Edney; Henry; Clema Lewis ("Lewis"), a counselor with the Women's Coalition; DHS social worker, Hope Thornhill ("Thornhill"); and a police officer. [*Id.*]. The girls also gave statements to the police at that time. [Supp.App. at 207]. Following the initial examination, the girls started counseling sessions with Lewis. However, that ended after four sessions, when Lewis expressed concern that Williams had moved back into the home. [Supp.App. 323–24]. After it was revealed that Williams was back in the home, the girls were temporarily removed from their home for several months. [Supp.App. 192]. Following Williams' arrest, the girls were returned to their mother.

In the initial report given to police, the girls spoke candidly about what happened to them. They were also open with Matthew, Thornhill and Lewis, consistently repeating their allegations and details of the sexual abuse.

Prior to trial, Edney took the girls for another physical examination to a Dr. Lisa McMahon ("Dr.McMahon"), who was not called to testify at trial. Just days before trial, Edney also took the girls for yet another examination, to Dr. Noel Carr ("Dr.Carr"). Dr. Carr concluded the girls had intact hymens and attempted to testify at trial that Dr. McMahon had concluded similarly. [Supp.App. at 346–50]. The trial court precluded as inadmissible hearsay testimony regarding Dr. McMahon's reported findings, since she was not a witness a trial. However, Dr. Carr was permitted to testify regarding his own findings.

Prior to trial, the girls stopped cooperating with police and with the prosecution. By the time of trial, they had become uncooperative and angry, and repeatedly expressed their unwillingness to go forward with testimony. Edney invoked her Fifth Amendment privilege at trial when called to give testimony.

Following a jury trial, Williams was convicted of three of the six counts: unlawful sexual contact in the first degree, and two counts of child abuse. Following his conviction, Williams moved for judgment of acquittal; that motion was denied, and this appeal followed. This Court heard oral arguments on April 4, 2003.

## II. JURISDICTION AND STANDARD OF REVIEW

This Court has appellate jurisdiction to review judgments and orders of the Territorial Court in all criminal cases in which the defendant has been convicted, other than on a plea of guilty. VIRGIN ISLANDS CODE ANN. tit. 4, § 33; Section 23A of the Revised Organic Act of 1954.

 The appellate court accords plenary review to the trial court's interpretation of legal precepts; however, factual findings are reviewed for clear error. *Id.; See, Poleon v. Government of the V.I.*, 184 F.Supp.2d 428 (D.V.I.2002). In the criminal context, the court's factual findings are clearly erroneous if it is evident "the factfinder in the first instance made a mistake in concluding that a fact had been proven under the applicable standard of proof." *See, Bryan v. Government of the V.I.*, 150 F.Supp.2d 821, 827 n. 7 (D.V.I.2001).

## III. DISCUSSION

Williams urges reversal of his conviction, arguing his trial was constitutionally defective and his right to a fair trial impaired as a result of various trial errors. Each challenge will be discussed in turn.

### A. Did the Court Admit Impermissible Hearsay Testimony?

Williams first argues that admission of hearsay testimony of a physician, counselor, social worker, and one of the victims' father was improper and impermissibly influenced the jury's guilty verdict.

 On appeal, the trial court's admission of testimony or other evidence under the Federal Rules of Evidence is reviewed for abuse of discretion. *See, Government of V.I. v. Texido*, 89 F.Supp.2d 680, 683 (D.V.I.2000) (citation omitted). However, the court's interpretation of those rules is subject to plenary review. *Id.;* see, also,

*United States v. Velasquez*, 64 F.3d 844 (3d Cir.1995).

 Witnesses at trial are generally precluded from testifying regarding the out-of-court statements of third persons, *see,* FED. R. EVID. 801, 802, and with good reason. Foremost are concerns that, because such statements are far removed from the declarant, precluding either the accused or the court from testing the declarant's credibility or the circumstances surrounding its making, they cannot be presumed reliable. *See, e.g., Government of V.I. v. Joseph*, 964 F.2d 1380 (3d Cir. 1992); *see, also, Idaho v. Wright*, 497 U.S. 805, 817, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990). However, the federal rules recognize several exceptions to this general proscription, permitting out-of-court statements which, because of the circumstances surrounding their making, suggest their inherent reliability and do no violence to the policies underlying the hearsay rules. *See, generally,* FED. R. EVID. 803; *Wright*, 497 U.S. at 817, 110 S.Ct. 3139. Among those exceptions, and relevant here, is the medical diagnosis exception, which excepts from the hearsay rule:

> Statements *made for purposes of medical diagnosis or treatment* and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof as reasonably pertinent to diagnosis or treatment.

FED. R. EVID. 803(4). Such statements are regarded as inherently reliable because of the recognition that one seeking medical treatment is keenly aware of the necessity for being truthful in order to secure proper care. *See,* FED. R. EVID. 803(4), advisory committee note; see, also, *White v. Illinois*, 502 U.S. 346, 355, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992). The standard for determining whether statements may be properly admitted under this exception is:

whether statements were made for the purpose of securing medical treatment; whether they were *reasonably pertinent* to such treatment, and whether they were reasonably relied upon for treatment. *See, Government of V.I. v. Morris,* 191 F.R.D. 82 (D.V.I.1999). Statements admissible under the medical diagnosis exception are limited to issues of causation and do not generally extend to fault, because identification of the perpetrator lacks the necessary nexus to treatment goals. *See,* FED. R. EVID. 803(4) *advisory committee's note.* However, this limitation has been removed where the challenged statements are made by child sex abuse victims. *See, e.g., United States v. Renville,* 779 F.2d 430, 436 (8th Cir.1985). Thus, statements by a child victim identifying the perpetrator of the crime during the course of seeking medical treatment may, nonetheless, be admissible under 803(4), particularly where the perpetrator resides in the same household. *Id.* This is not a departure from the general prohibition against admission of statements focused on fault but, rather, an acknowledgment that identification of the perpetrator in child sexual abuse cases is often an essential part of securing full treatment for the child victim—for both the physical and psychological harm resulting from the abuse. *Id.; see, also, United States v. Tome,* 61 F.3d 1446, 1449–51 (10th Cir.1995); *but, see,*

*United States v. Sumner,* 204 F.3d 1182, 1185 (8th 2000)(statement of child victim to psychologist not admitted where the child was not told, nor understood, that the questioning was for the purpose of treatment). An integral part of such treatment often includes removal from the home. *See, Renville,* 779 F.2d at 435–39; *United States v. Shaw,* 824 F.2d 601, 608 (8th Cir.1987), *cert.denied,* 484 U.S. 1068, 108 S.Ct. 1033, 98 L.Ed.2d 997(1988).

**1. Testimony of Dr. Mavis Matthew**

 Appellant argues that statements by the minor victims to Dr. Matthew, a pediatrician and the first physician to examine the girls after allegations of sexual abuse arose, lacked sufficient guarantees of trustworthiness which form the basis for admission under Rule 803(4) or 807.[1] In support of this argument, appellant contends Matthew's testimony was rendered unreliable, under either hearsay exception, by her failure to record the medical history verbatim; to recall at trial the exact words each child used in describing the abuse; her failure to recall specific details surrounding the examination, such as the order in which each girl was examined and which adult was present in the room at the time; and her failure to indicate the method of questioning used.[2] These arguments will be readily rejected, as they do not fall within the concerns the reliability determination aims to address.[3]

1. The children were taken to Dr. Matthew and revealed the nature of the abuse, as well as the identity of the perpetrator as their stepfather, during an examination with Dr. Matthew, after having been taken there for medical treatment connected with the reported abuse. Thus, the medical treatment exception is applicable here, and the court need not analyze the applicability of Rule 807, which applies only where another firmly-rooted exception is inapplicable.

2. Although appellant now seeks to also attack those statements based on alleged suggestiveness of the questioning by Dr. Matthew, that

issue was not raised below, and this Court should not address it for the first time on appeal.

3. After having the opportunity to refer to the medical records compiled for each child after the examination, Dr. Matthew testified on direct examination over the appellant's objection:

 Q: What is the information that [M.H.]provided to you when you were taking the information from her?

 A: [M.H.], 12 years of age, sexual assault. She alleged that a Eugene Williams assaulted her—that was not the word she

Rather, the reliability inquiry must center on factors which establish the likelihood that the declarant was telling the truth at the time the statement was made. *See, e.g., United States v. Mitchell,* 145 F.3d 572, 579(3d Cir.1998)(finding error, where reliability established from corroborating information at trial, rather than based on the making of the statement); *United States v. Balfany,* 965 F.2d 575, 581 (8th Cir.1992)(noting that only circumstances surrounding the hearsay statements *when they are made* are relevant in determining the trustworthiness of the statements). The appellant's concerns regarding the accuracy of Dr. Matthew's testimony or her alleged inability to recollect specific facts raise questions of credibility, whose assessment lies with the jury. *See, e.g., United States v. Isaac,* 134 F.3d 199 (3d Cir. 1998).[4] Having had the benefit of the government's examination and the defense's cross-examination, the jury ultimately weighed the issue of credibility in

the government's favor, and its determination in that regard will be left undisturbed.

**2. Whether Admission of Clema Lewis' and Hope Thornhill's Testimony Was Error.**

As with Dr. Matthew, M.H. and K.J. both saw Clema Lewis and Hope Thornhill, a counselor and social worker, respectively, for treatment purposes. Their statements are, therefore, also admissible under the medical diagnosis exception. *See, e.g., Balfany,* 965 F.2d 575, 581 (8th Cir.1992)(noting admissibility of statements, under 803(4), made to a trained social worker or psychologist for treatment related to emotional or psychological injuries) (citations omitted). The court also finds unpersuasive the appellant's argument that Thornhill is not sufficiently trained to regard the victim's hearsay statements to her as reliable under Rule 803(4).[5] Appellant grounds his argu-

---

used—but in 1995, her stepfather, that this sexual contact began a couple days after . . . occurred a couple days after her mother's wedding. Until one year ago it occurred, "At our house in Clifton Hill and Mary's Fancy." And she cannot enumerate the frequency in number, cannot recall count. She indicated that it occurred when she was left alone at home with the individual.
[Supp.App. At 260–61](quotation marks in original). Dr. Matthew testified similarly with regard to K.J.:

Q: And what, if anything, did [K.J.]relate to you in this portion of your interview with her?

A: [K.J.]was presented as a nine year-old and stated, "My mommy left me at home and Williams touched my private part" . . . . It occurred more than once and she was able to state that it occurred before January 1998, but the remainder of her examination was limited, as I began to say, because she was crying. She was cowered with fear and she was withdrawn.
[Supp.App.at 271–72] (quotations in original).

4. Appellant additionally contends Dr. Matthew failed to establish the manner in which she conducted the interview, resulting in a presumption of unreliability. While the conduct of an interview bears on reliability, there is no evidence on this record that the physician's interview was suggestive. Nor did the appellant raise an issue at trial calling into question the manner of the interview. Appellant had ample opportunity, through cross-examination, to attempt to impugn the credibility of Dr. Matthew before the jury and, in fact, did so.

5. Appellant additionally asserts the court permitted the government to offer the "expert" testimony—of Thornhill, Matthews, and Lewis—without providing timely pre-trial notice and denied a motion *in limine* to exclude this testimony and for a *Daubert* hearing. It is clear from the record, however, that those witnesses were not offered as experts. The only medical expert witness offered at trial was that of the defense—Dr. Noel Carr, who was admitted as an expert in gynecology and obstetrics.

ment on a single reference in *Balfany*, 965 F.2d at 581, to a "trained social worker". However, the admissibility of statements under Rule 803(4) is based, not on the person to whom made, but on the purpose for which they are made, which gives rise to presumption of reliability. *See*, FED. R. EVID. 803(4). Indeed, the comments to the rule note: "Under the exception the statement need not have been made to a physician. Statements made to hospital attendants, ambulance drivers or even family members might be included." FED. R. EVID. 803(4), advisory committee note. A statement to a social worker or counselor may, therefore, be admissible if the reliability factors noted above are shown—that is, the statements were reasonably pertinent to medical treatment and made for that purpose. Neither the rule, the advisory committee notes nor the factors adopted by the courts require inquiry into the training of the person to whom the statements were made; indeed, such a requirement would be in conflict with the purpose of the rule. Although *Balfany* spoke in terms of a "trained social worker," that court did not engage in any analysis to suggest that a training component ought to be appended as an essential factor to establish reliability. This Court also .declines to do so.[6] These issues all go to credibility and weight, rather than to admissibility of the evidence.

### 3. Michael Henry's Testimony

■ At trial, the court also permitted M.H.'s father, Michael Henry, to offer hearsay testimony regarding what the girls told him about the abuse. Williams now argues Henry's testimony was improper under the residual exception to the hearsay rule, where the victims also testi-

fied. He additionally argues Henry was permitted to testify regarding statements made by Edney, which constituted improper impeachment. This Court disagrees.

■ Third-party statements not specifically covered by any other hearsay exception, though having equivalent circumstantial guarantees of trustworthiness, may be admitted if the court determines:

(A) the statement is offered as evidence of a material fact;

(B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and

(C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

FED. R. EVID. 807; *see, also, Tome v. United States*, 513 U.S. 150, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995)(The linchpin is the existence of strong indicia of trustworthiness.). The court's determination of trustworthiness bears on whether "the child declarant was particularly likely to be telling the truth when the statement was made." *White v. Illinois*, 502 U.S. 346, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992); see, also, *Morris*, 191 F.R.D. 82. There is no "mechanical test" for determining trustworthiness, although the following factors may guide the court's determination: spontaneity and consistent repetition; the mental state of the declarant; use of terminology unexpected of a child of similar age; and lack of motive to fabricate. *See, Idaho v. Wright*, 497 U.S. 805, 820–22, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990).

---

6. It should be noted, however, that Thornhill testified to having a bachelor's degree in sociology and a master's degree in social work. She additionally testified to having practiced as a social worker for five years, with a concentration on child abuse cases. Therefore, appellant's assertions that she lacked training are without merit. [Supp.App. at 199–200].

At trial, the court sustained appellant's hearsay objections, barring Henry's testimony regarding Edney's statements about initial allegations of abuse as improper impeachment. [Supp.App. 180–81]. However, the court did permit Henry to give limited testimony regarding an agreement with Edney to have the girls taken to a doctor and his subsequent report to authorities after she told him she had not done so. [Supp.App. at 186]. Henry was additionally permitted to testify regarding statements both M.H. and K.J. made to him relating the abuse, over the appellant's objections that they—and particularly M.H.—had later denied having that conversation. [J.A. at 182]. These statements meet the standards established for admission under Rule 807.

At the time the girls reported the abuse to Henry, M.H. was 11–years old, and K.J. was 8 years old. Having reported the abuse to their mother a year earlier and later being told they were disbelieved, while the alleged perpetrator continued to live in their home, the girls had a particularly strong motive to tell M.H.'s father the truth. They had already confided in the only biological parent in the home— and probably the one person they trusted to secure their care—only to be told they were not to be believed. It has not been shown that, at the point they revealed the abuse to Henry, the girls had a motive to fabricate the allegations. Rather, they appear to have had every motive to be truthful in hopes that Henry, unlike their mother, would act to alleviate their situation. Under these circumstances, and knowing their mother had already indicated she disbelieved them, Henry presented possibly the first real opportunity the girls had to invoke the help of an adult to stop the abuse. Additionally, even one year after

the initial report, both girls remained consistent in the details of the abuse.

Appellant's additional argument that Henry's testimony was not probative of any issue of fact and merely intended as improper impeachment of Edney is also without merit.[7] At trial, Henry was permitted to testify regarding the initial revelation to him which led to the medical examination. The victims' mother was not cooperating with authorities and invoked her Fifth Amendment right against self-incrimination at trial. Finally, although the victims testified in this case, they were particularly evasive and, in the case of the younger victim, very emotional on the stand. M.H., in particular, also expressed an unwillingness to testify because of the "stress" that was being brought to bear on her. During that testimony, the girls also attempted, on several occasions, to retreat from their earlier accusations. *Compare, Renville,* 779 F.2d at 432 (probativeness established where young child abuse victim recanted testimony). Given the girls' reluctance to give full testimony at trial and the unavailability of Edney, Henry's testimony was most probative of how the abuse came to light and why the girls were taken for medical care. *Compare, United States v. Dunford,* 148 F.3d 385 (4th Cir.1998); *see, also, Shaw,* 824 F.2d at 608 ("[W]hile Congress intended the residual hearsay exception to be used very rarely, and only in exceptional circumstances ... one such exceptional circumstance generally exists when a child abuse victim relates to an adult the details of the abusive events.").

### 4. The Reading of Hearsay Statements

█ Appellant also alleges the court improperly permitted the prosecutor to

---

**7.** Evidence is "probative" if it tends to establish that the crime was more likely or less likely to have occurred. *See,* FED.R.EVID. 401.

read into the record large portions of the hearsay statements of the minors, despite the children's "recantation" prior to trial. [Appellant's Br. at 29]. The gravamen of appellant's argument in this regard is that the court should not have permitted the minors' prior statements to be published to the jury in that manner, since at the time of trial the minors had denied making some of those statements.

■ That a witness later disowns a prior statement is not, in itself, grounds for it to be simply discarded. Rather, the prior inconsistent statement presents a credibility issue which is more properly put to the jury. *See*, FED. R. EVID. 613. This is particularly the case where the victims are children and where there are factors which may affect a child's ability to fully testify.[8]

## B. Whether Trial Court Improperly Curtailed Defense Cross–Examination and Excluded Defense Evidence.

### 1. Limited Cross–Examination

■ A trial court may impose reasonable limits on cross-examination in consideration of the needs of the case, and this court reviews such limitations for abuse of that discretion. *See*, *United States v. Casoni*, 950 F.2d 893, 902(3d Cir.1991); *see, also, Douglas v. Owens*, 50 F.3d 1226,1230 (3d Cir.1995)(court may consider factors such as "undue prejudice, relevancy, and delay due to repetition"). An abuse of discretion is shown where the jury is left with insufficient information to determine a witness' motives or bias. *See*, *Casoni*, 950 F.2d at 902. "A restriction [on cross-examination] will not constitute

reversible error unless it is so severe as to constitute a denial of the defendant's right to confront witnesses against him and it is prejudicial to substantial rights of the defendant." *Id.*

■ Here, appellant argues the trial court improperly limited the cross examination of Dr. Matthew, preventing him from attempting to impugn Dr. Matthew's credibility and the reliability of the methodology used to determine that the girls' hymens were absent. [Supp.App. At at 42–44]. Viewed in the context of the examination at trial, this argument has no merit.

On cross-examination, the defense questioned Dr. Matthew about her methods and attempted to establish that she had previously disagreed with other physicians in another criminal case regarding whether the hymens were present in two other alleged child victims a year earlier. Dr. Matthew could not recall the children and stated unequivocally that she also could not recall what diagnosis was made with regard to those children without the benefit of her medical records. [Supp.App. at 284–89]. The court properly required the defense to accept Dr. Matthew's answer and properly precluded defense counsel from having her produce her medical records for the purpose of impeaching her with prior conduct. *See*, FED. R. EVID. 608(b), 611(a).

■ Appellant additionally argues Dr. Matthew's methodology in determining there was no hymen in either girl must be rejected as flawed, where her method was rejected by the defense expert, Dr. Carr. Appellant's conclusion rests on the flawed

8. Even if the court accepts appellant's characterization of what occurred as a "recantation," that fact would not warrant reversal here. Courts are reluctant to consider recantation testimony because they are viewed as extremely unreliable and do not compel re-

versal unless the trial court is "satisfied that the testimony is true." *Cf., Commonwealth v. Gaddy*, 492 Pa. 434, 424 A.2d 1268 (1981); *Commonwealth v. Nelson*, 484 Pa. 11, 398 A.2d 636 (1979).

premise that lay testimony is nullified where contrary expert testimony is presented. That is not the case. As with any other testimony presented at trial, expert testimony is subject to the jury's credibility determinations and may be accepted or rejected, in part or in whole. *See, e.g., Hassan v. Stafford*, 472 F.2d 88, 96 (3d Cir.1973); *United States v. Barber*, 442 F.2d 517, 522–23 (3d Cir.1971). Where, as here, there is contradictory testimony, the jury is charged with the responsibility to sift that testimony and decide the extent to which each witnesses' testimony should be credited and the weight to be given each. *See, Barber*, 442 F.2d at 523. This credibility determination is to be resolved by the factfinder, rather than by evidentiary ruling by the court.

### 2. Exclusion of Defense Evidence

■■■■■ An accused has a constitutionally protected right to present a full defense, without undue interference by the court. See, *Government of the V.I. v. Mills*, 956 F.2d 443 (3d Cir.1992). Where the court excludes defense testimony, reversible error may be shown only where the excluded testimony would have likely affected the verdict. *Id.* (quoting *United States v. Valenzuela–Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982); *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481(1985)).

■■■■ Appellant argues the trial court impeded his ability to mount a full defense by limiting the testimony of his defense witnesses—Dr. Carr, Edney and Lornette Daniel ("Daniel")—surrounding an examination and report of Dr. Lisa McMahon. Appellant contends the proffered testimony would have contradicted the testimony of Dr. Matthew regarding the absence of the girls' hymens. This Court disagrees.

Prior to trial, the girls were examined by Dr. McMahon, who apparently devel-oped a written report. However, Dr. McMahon was not offered as a witness at trial. Nonetheless, the appellant sought to have Edney and Daniel offer testimony that Dr. McMahon told them what a hymen was and then pointed out the girls' hymens during an examination. [Supp. App. at 390]. The court ruled the proffered testimony was inadmissible hearsay, but permitted counsel an opportunity to develop his questioning to delve into the witnesses' personal knowledge regarding hymens. *Id.; see, also,* FED. R. EVID. 801–802. Notwithstanding the court's limitation, defense counsel continued to elicit hearsay testimony, [Supp.App. at 392–94], and the court instructed counsel to move on. No error can be found in that ruling.

Dr. Carr, who examined the girls several days prior to trial and a year after Dr. Matthew's initial examination, likewise would have merely recounted Dr. McMahon's report as further corroboration of his opinion that the girls' hymens were intact. Significantly, Dr. McMahon did not testify at trial and, therefore, would have been unavailable for cross-examination to permit the government—and the jury—to test her credibility and question her regarding her report. This Court, therefore, finds no basis for reversal in the errors claimed above.

### C. Whether the Court Erred in Denying Appellant's Motion for Judgment of Acquittal Based on Alleged Brady Violation.

■■■■ Appellant further urges this Court to find *error* in the court's denial of his motion for judgment of acquittal, based on an alleged Brady violation. In reviewing that question, this court determines whether, "viewing all the evidence adduced at trial in the light most favorable to the government, there is substantial evidence from which the jury could find guilt be-

yond a reasonable doubt". *See, Government of V.I. v. Bradshaw,* 569 F.2d 777, 779 (3rd Cir.1978), *cert.denied,* 436 U.S. 956, 98 S.Ct. 3070, 57 L.Ed.2d 1121(1978). The court does not assess the credibility of the witnesses or weigh the evidence. *Id.* When a Brady violation is alleged, however, the Court reviews issues of law *de novo* and factual findings for clear error. *See, United States v. Ramos,* 27 F.3d 65,67 (3d Cir.1994).

 Appellant argues on appeal the government failed to disclose prior to trial that the victims had "recanted" their allegations. Under the standards developed by the U.S. Supreme Court in *Brady v. Maryland,* the prosecutor is compelled to turn over to the defense *prior* to trial any evidence which may be favorable to the accused. *See, Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215(1963). Failure to turn over such evidence results in denial of the defendant's due process right to a fair trial and constitutes reversible error, where the evidence is material to guilt or to punishment. *Id.* Non-disclosure of impeachment evidence may also be *Brady* material if the defendant's guilt or innocence hinges on the reliability of the witness. However, "the government is not obliged under *Brady* to furnish a defendant with information which he already has or, with any reasonable diligence, he can obtain himself." *United States v. Starusko,* 729 F.2d 256, 262 (3d Cir.1984).

 Appellant persists in his argument that the Government failed to disclose the victims' recantation of the allegations of abuse. However, the appellant's brief and references to the record belies this assertion. In his brief, the appellant directs the court to *a pretrial* motion filed by the government on July 19, 2001 indicating that the victims had stopped cooperating with the government. [Appellant's Br. at 21]. In its opening statements, the government also revealed that the children were claiming that nothing had happened to them. [Supp.App. at 43]. The defense similarly argued in opening arguments that the girls did not want to come to court. [Supp.App. at 55]. Moreover, during their examination and cross-examination testimony, the girls made it quite clear they did not want to participate in the prosecution and, on questioning by the defense, also said some of their allegations were untrue. [Supp.App. at 175–76; 68, 75,80]. Moreover, subpoenas had to be issued for the witnesses to appear to give testimony, [Supp.App. At 79], because of their unwillingness to do so. Given these facts, which were known to both parties in advance of trial and during trial, and given the appellant's opportunity to cross-examine the witnesses' on the truthfulness of their statements, the appellant cannot now claim surprise that the victims had retreated somewhat from their initial allegations. *See, Brown v. United States,* 556 F.2d 224, 228 (3d Cir.1977).[9]

**D. Whether the Trial Judge's Questioning of a Witness Denied the Defense a Fair and Impartial Trial.**

██ Williams next argues the trial court shed its cloak of objectivity and assumed the role of a partial advocate through its questioning of M.H. [Supp.App. at 62–76]. However, there is no basis, on this record, for determining the trial court exceeded its discretion to question a witness under Federal Rule of Evi-

---

9. The mere fact that a witness—particularly a child witness—has recanted allegations does not conclusively resolve the issues of the case. For obvious reasons, recantations in child sex cases are often viewed with some skepticism and do not necessarily have any effect on a pending case. *Compare, State v. Russo,* 700 A.2d 161, 172 (Del.Super.1996); *cf., Console,* 13 F.3d at 654.

dence 614(b). The questioning of M.H. was proper and limited only to the court's attempts to get her to respond to the questions as directed, after she expressed a reluctance to do so for fear of repercussions.

### E. Whether the Evidence was Sufficient to Support a Conviction.

 Appellant's final challenge to the sufficiency of the evidence must similarly be rejected. The trial court had before it the testimony of Dr. Matthew establishing penetration of the victims; the victims' testimony and multiple statements to various individuals detailing the crimes. Viewed in the light most favorable to the government, the testimony and other evidence adduced at trial was sufficient evidence from which a reasonable jury could find the appellant guilty beyond a reasonable doubt of the offenses. *See, Georges v. Government of V.I.,* 119 F.Supp.2d 514, 523 (D.V.I.2000);*see, also, United States v. Console,* 13 F.3d 641, 654 (3d Cir.1993).

### F. Whether the Trial Court Erred in Permitting the Government to Call and Repeatedly Question a Witness Before the Jury, After She Had Invoked Her Fifth Amendment Right Against Self–Incrimination.

 Of all the other claims raised in the instant appeal, the Government's continued questioning of Edney after invocation of her Fifth Amendment right against self-incrimination gives this Court great pause.

At trial, the Government called the children's mother to the stand and attempted to elicit testimony regarding her knowledge of the sexual abuse. However, Edney—who was also at that time facing charges for child neglect in connection with the abuse—immediately invoked her Fifth Amendment right against self-incrimination. Nonetheless, the Government continued a lengthy examination of Edney during which she asserted her Fifth Amendment right no fewer than 70 times, in response to all of the substantive questions, and responded to only routine or statistical information. Appellant claims error in the court's allowance of such continued questioning. This Court agrees that the prosecutor's questioning constitutes grave error warranting reversal of the appellant's conviction.

 Pursuing questioning after a witness has invoked the Fifth Amendment does not automatically create reversible error. *See, Namet v. United States,* 373 U.S. 179, 185–187, 83 S.Ct. 1151, 10 L.Ed.2d 278 (1963). Such error may arise, however, where it is shown: 1)the government made a "conscious and flagrant attempt" to build its case out of inferences arising from use of the testimonial privilege, and; 2) where inferences from a witness' refusal to answer added critical weight to the prosecution's case in a form not subject to cross-examination, and thus unfairly prejudiced the defendant. *See, Namet,* 373 U.S. at 185–187, 83 S.Ct. 1151(noting that court must look to the circumstances of each case)(citing *United States v. Maloney,* 262 F.2d 535 (2d Cir. 1959); *United States v. Tucker,* 267 F.2d 212 (3d Cir.1959)); compare, *Bowles v. United States,* 439 F.2d 536 (D.C.Cir. 1970),*cert. denied,*401 U.S. 995, 91 S.Ct. 1240, 28 L.Ed.2d 533 (1971)(jury may not draw inference from witness' decision to invoke Fifth Amendment privilege).

It became immediately apparent after Edney took the stand that she would invoke the Fifth Amendment for all but statistical data because she, too, was threatened with criminal charges. Indeed, Edney refused to answer just about all of the substantive questions. Nonetheless, the prosecutor persisted with a lengthy examination, including leading questions, resulting in Edney's repeated

invocation of her Fifth Amendment privilege. [Supp.App. 122–142]. This type of examination served to do nothing more than put before the jury, not only the fact that Edney had invoked the Fifth Amendment, which itself may give rise to prejudicial inferences, but also permitted improper inferences regarding the unanswered questions. *See, e.g., Douglas v. Alabama,* 380 U.S. 415, 416–417, 85 S.Ct. 1074, 13 L.Ed.2d 934(1965); *Compare, Namet,* 373 U.S. at 185–187, 83 S.Ct. 1151. The potential for improper inferences is particularly troubling here, given the witness' close relationship to the defendant and the victims, and the fact that it was made known to the jury that she was then targeted for child abuse charges herself—all of which could permit the jury to infer that the questions asked by the prosecutor suggested what the answers may have been. *Namet,* 373 U.S. at 185–187, 83 S.Ct. 1151 (1963). The leading form of many of the Government's questions which, by their very nature, suggested the existence of certain critical facts to the jury, served to unfairly bolster the prosecution's case in a form not subject to challenge by cross-examination—that is, without requiring the witness to waive her Fifth Amendment privilege.

Although the court, at the conclusion of the Government's examination, instructed the jury not to draw inferences from the questions asked of Edney or from the fact that she had invoked her Fifth Amendment privilege, [Supp.App. at 146], that instruction could not undo the prejudicial impact of the lengthy questioning and Edney's repeated invocation of her Fifth Amendment privilege.

Under certain circumstances, where the questioning is brief and ceases once the privilege is invoked, such curative instructions may sufficiently cure the potential for prejudice to a defendant arising from a witness' invocation of the Fifth Amendment in the presence of a jury. In *Namet,* on which the Government relies, the court found no prejudicial error in the questioning of two witnesses who had invoked the privilege. *See, Namet,* 373 U.S. at 187, 83 S.Ct. 1151. However, the court's determination rested on the fact that the witnesses had given lengthy responses to some substantive questions, while selectively refusing to answer approximately four questions. *Id.* The Second and Ninth Circuit Courts of Appeals have similarly held curative instructions adequate where the witnesses were asked a mere one or two questions after having invoked the privilege. *See, United States v. Gernie,* 252 F.2d 664, 669 (2d Cir.1958); *Weinbaum v. United States,* 184 F.2d 330, 330–331(9th Cir.1950). Here, unlike the decisions noted above, the prosecutor's questions were more than mere "minor lapses." *See, e.g., United States v. Hiss,* 185 F.2d 822, 832 (2d Cir.1950). Rather, the lengthy questioning of the witness in the presence of the jury was clearly suggestive and prejudicial to the defendant. *See, e.g., Robbins v. Small,* 371 F.2d 793, 794 (1st. Cir.1967)(finding prejudicial error, notwithstanding jury charge, where witness was forced to invoke privilege 14 times during continued questioning regarding a prior statement, because "the inferences already firmly implanted in the minds of the jurors could not thereby be erased"); *State v. Dinsio,* 200 N.E.2d 467, 472(Ohio 1964)(noting that "long, detailed and repetitious questions of the prosecutor" directed to a witness associated with defendant after privilege invoked was prejudicial error); *State v. Cullen,* 103 N.J.Super. 360, 247 A.2d 346, 349 (N.J.Super.1968)(noting that, though it was not error to place witness on the stand, the court committed prejudicial error "in permitting the prosecutor to continue his line of questioning, which placed before the jury innuendo evi-

dence or inferences of evidence", once it was established that the witness intended to claim a privilege);*compare, Bank of Nova Scotia v. United States,* 487 U.S. 250, 258–259, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988)(noting there was no prejudicial error where prosecutor immediately ceased questioning once witness invoked the privilege). In this instance, as the *Robbins* court noted, "When it became apparent to the prosecutor that [the] witness was broadly claiming the privilege, basic fairness required that he discontinue his leading questions." *See, Robbins,* 371 F.2d at 794. The prosecutor's persistent questioning of Edney so infected the defendant's trial that nothing short of reversal could cure this error.

## IV. CONCLUSION

The appellant's hearsay and evidentiary challenges do not provide a basis for disturbing the lower court's judgment in this case. However, this Court concludes that the trial court's allowance of a lengthy direct examination of a witness in the presence of the jury, following her assertion of her Fifth Amendment privilege against self-incrimination, constitutes reversible error. Therefore, in view of the foregoing, the appellant's conviction will be reversed. An appropriate order follows.

### *ORDER*

For the reasons stated in an accompanying Memorandum Opinion of even date, it is hereby

**ORDERED** that the conviction of Eugene Williams is **REVERSED**.