http://www.va.gov/vetapp16/Files4/1630404.txt

Citation Nr: 1630404 
Decision Date: 07/29/16 Archive Date: 08/04/16

DOCKET NO. 09-21 216 ) DATE
 )
 )

On appeal from the
Department of Veterans Affairs Regional Office in Houston, Texas

THE ISSUES

1. Entitlement to an increased rating for residuals of a left tibia injury, to include osteomyelitis, rated as 0 percent disabling prior to July 25, 2015, and as 20 percent disabling on and after that date.

2. Entitlement to an increased rating for a scar on the distal left tibia, rated as 0 percent disabling prior to July 25, 2015, and as 20 percent disabling on and after that date.

3. Entitlement to service connection for left knee arthritis, to include as secondary to a service-connected disability of the distal left tibia.

4. Entitlement to service connection for a cervical spine disability, to include as secondary to a service-connected disability of the distal left tibia.

5. Entitlement to service connection for a heart disability, to include as secondary to a service-connected disability of the distal left tibia.

6. Entitlement to service connection for hypertension, to include as secondary to a service-connected disability of the distal left tibia.

7. Entitlement to service connection for an acquired psychiatric disability, to include as secondary to a service-connected disability of the distal left tibia.

8. Entitlement to service connection for a lumbar spine disability, to include as secondary to service-connected disability of the distal left tibia.

REPRESENTATION

Appellant represented by: Texas Veterans Commission

ATTORNEY FOR THE BOARD

Elizabeth Jalley, Counsel

INTRODUCTION

The Veteran served on active duty from September 1963 to September 1966.

This matter comes before the Board of Veterans' Appeals (Board) on appeal from October 2006 and May 2012 rating decisions of the Department of Veterans Affairs (VA) Regional Office (RO) in Houston, Texas.

The October 2006 rating decision denied entitlement to a compensable evaluation for residuals of a left tibia injury, to include osteomyelitis, and denied entitlement to service connection for left leg arthritis, a heart disability, hypertension, a cervical spine disability, and an acquired psychiatric disability. A notice of disagreement was received in January 2007, a statement of the case was issued in April 2009, and a substantive appeal was received in June 2009.

A November 2015 rating decision granted an increased rating for what has been recharacterized as "status post 2 old healed fractures status post surgery with screw fixation and osteomyelitis of the distal left tibia." This rating decision increased the rating for this disability from 0 percent to 20 percent, effective July 25, 2015. Because this increase constitutes less than a full grant of the benefit sought, this issue remains on appeal. AB v. Brown, 6 Vet. App. 35, 39 (1993). 

The November 2015 rating decision also assigned a separate, 20 percent rating for scarring of the left distal tibia, effective July 25, 2015. Because this issue is part and parcel of the osteomyelitis rating issue, it is considered to be on appeal and will be adjudicated by the Board herein.

The May 2012 rating decision denied entitlement to service connection for a low back disability. A notice of disagreement was received in June 2012, a statement of the case was issued in February 2013, and a substantive appeal was received in February 2013.

In October 2012, the Board remanded all of the issues except for the scar increased rating claim and the lumbar spine service connection claim for additional development, and the case has been returned for further appellate review. 

The issues of entitlement to service connection for a lumbar spine disability and hypertension are addressed in the REMAND portion of the decision below and are REMANDED to the Agency of Original Jurisdiction (AOJ).

FINDINGS OF FACT

1. Prior to July 25, 2015, the residuals of the Veteran's left tibial disability, to include osteomyelitis, were not manifested by active infection within the prior five years. 

2. On and after July 25, 2015, the residuals of the Veteran's left tibial disability, to include osteomyelitis, were manifested by discharging sinus or other evidence of active infection within the past 5 years, but not by definite involucrum or sequestrum; frequent episodes with constitutional symptoms; symptoms of the pelvis, vertebrae, or extending into major joints, or with multiple localizations or with long history of intractability and debility, anemia, amyloid liver changes or other continuous constitutional symptoms.

3. For the entire period that is contemplated by this appeal, the scar on the Veteran's distal left tibia has been painful, but it has not been deep or unstable, it has not covered an area of at least 929 square centimeters, and it has not resulted in additional impairment.

4. The Veteran did not exhibit a left leg disability in service, degenerative joint disease of the left knee was not exhibited in service or within one year after discharge from service, and a left leg disability is not otherwise shown to be associated with his active service or with a service-connected disability.

5. A neck disability was not demonstrated in service, and the only competent evidence on the question of a medical nexus between any current neck disability and service or a service-connected disability weighs against the claim.

6. A preponderance of the competent and probative evidence of record establishes that the Veteran does not have a current heart disability for VA purposes.

7. The Veteran did not exhibit an acquired psychiatric disability in service, a psychosis was not exhibited in service or within one year after discharge from service, and an acquired psychiatric disability is not otherwise shown to be associated with his active service or with a service-connected disability.

CONCLUSIONS OF LAW

1. Prior to July 25, 2015, the criteria for the assignment of a compensable rating for residuals of a left tibia injury, to include osteomyelitis, have not been met. 38 U.S.C.A. §§ 1155, 5103, 5103a, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 4.71a, Diagnostic Code 5000 (2015).

2. On and after July 25, 2015, the criteria for the assignment of a rating in excess of 20 percent for residuals of a left tibia injury, to include osteomyelitis, have not been met. 38 U.S.C.A. §§ 1155, 5103, 5103a, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.159, 4.71a, Diagnostic Code 5000 (2015).

3. Prior to July 25, 2015, the criteria for a rating of 10 percent, but no higher, for the scar on the Veteran's distal left tibia have been met. 38 U.S.C.A. §§ 1155, 5107, 7104 (West 2014); 38 C.F.R. §§ 4.7, 4.118, Diagnostic Codes 7800 through 7805 (effective prior to October 23, 2008); 4.118, Diagnostic Codes 7800 through 7805 (2015).

4. On and after July 25, 2015, the criteria for a rating in excess of 20 percent for the scar on the Veteran's distal left tibia have not been met. 38 U.S.C.A. §§ 1155, 5107, 7104 (West 2014); 38 C.F.R. §§ 4.7, 4.118, Diagnostic Codes 7800 through 7805 (effective prior to October 23, 2008); 4.118, Diagnostic Codes 7800 through 7805 (2015).

5. The criteria for establishing service connection for a left leg disability, including on a secondary basis, are not met. 38 U.S.C.A. §§ 1101, 1110, 1112, 1113, 1131, 1137, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.303, 3.307, 3.309, 3.310 (2015).

6. The criteria for establishing service connection for a neck disability, including on a secondary basis, are not met. 38 U.S.C.A. §§ 1101, 1110, 1112, 1113, 1131, 1137, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.303, 3.310 (2015).

7. The criteria for establishing service connection for a heart disability, including on a secondary basis, are not met. 38 U.S.C.A. §§ 1101, 1110, 1112, 1131, 1137, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.303, 3.310 (2015). 

8. The criteria for establishing service connection for an acquired psychiatric disability, including on a secondary basis, are not met. 38 U.S.C.A. §§ 1101, 1110, 1112, 1113, 1131, 1137, 5107 (West 2014); 38 C.F.R. §§ 3.102, 3.303, 3.307, 3.309, 3.310 (2015).

REASONS AND BASES FOR FINDINGS AND CONCLUSIONS

I. Veterans Claims Assistance Act

The Veterans Claims Assistance Act of 2000 (VCAA), Public Law No. 106-475, 114 Stat. 2096 (2000), substantially amended the provisions of chapter 51 of title 38 of the United States Code, concerning the notice and assistance to be afforded to claimants in substantiating their claims. VCAA § 3(a), 114 Stat. 2096, 2096-97 (2000) (now codified as amended at 38 U.S.C.A. §§ 5103, 5103A (West 2014)). In addition, VA published regulations, which were created for the purpose of implementing many of the provisions of VCAA. See 66 Fed. Reg. 45,620 (Aug. 29, 2001) (now codified, in pertinent part, at 38 C.F.R. § 3.159 (2015)).

The notice requirements of the VCAA require VA to notify the veteran of any evidence that is necessary to substantiate a claim, as well as the evidence VA will attempt to obtain and which evidence the veteran is responsible for providing. Quartuccio v. Principi, 16 Vet. App. 183 (2002). The requirements apply to all five elements of a service connection claim: veteran status, existence of a disability, a connection between the veteran's service and the disability, degree of disability, and effective date of the disability. Dingess/Hartman v. Nicholson, 19 Vet. App. 473 (2006). Such notice must be provided to a claimant before the initial unfavorable decision on a claim for VA benefits by the agency of original jurisdiction. Id; see also Pelegrini v. Principi, 18 Vet. App. 112 (2004). The VCAA notice requirements, however, may be satisfied if any errors in the timing or content of such notice are not prejudicial to the claimant. See Dingess, supra; Pelegrini, supra.

The Board finds that the notification requirements of VCAA have been satisfied in this case. In this regard, evidentiary development letters dated in August 2006, October 2009, and October 2012 advised the appellant of the evidence needed to substantiate his claims. These letters advised the Veteran of his and VA's responsibilities under the VCAA, to include what evidence should be provided by him and what evidence should be provided by VA. These letters also advised the Veteran as to the type of evidence needed to substantiate both the disability rating and effective date elements of his claims, pursuant to the Court's holding in Dingess, supra. 

The Board notes that the October 2009 and October 2012 letters were not issued prior to the initial adjudication of the majority of the Veteran's claims in October 2006, but that those claims were subsequently readjudicated, most recently in a March 2013 supplemental statement of the case. Thus, any deficiencies in the timeliness of these notice letters would not be prejudicial.

The Board further finds that the duty to assist requirements of the VCAA have also been satisfied in this case. 38 U.S.C.A. §§ 5103 and 5103A. Specifically, the Board finds that relevant evidence relative to the issues on appeal has been obtained and associated with the claims folder. In particular, the Board notes that the RO obtained the Veteran's service treatment records and VA medical records. The RO attempted to obtain the Veteran's Social Security Administration (SSA) records but was notified in June 2009 that these records are not available.

The RO arranged for the Veteran to undergo VA examinations in September 2006, March 2009, April 2012, December 2012, January 2013, February 2013, April 2013, and September 2015. The Board finds that the resulting examination reports are adequate for the purpose of determining entitlement to service connection and increased ratings. The examination reports reflect review of the claims file and interview and examination of the Veteran. During the examinations, the examiners elicited from the Veteran his history of complaints and symptoms, provided clinical findings detailing the examination results, and rendered etiology opinions that explain the reasons and bases for these opinions. The examination reports provide pertinent clinical findings detailing the results of the examinations to allow for effective evaluation of the Veteran's service-connected disabilities. For these reasons, the Board concludes that the reports in this case provide an adequate basis for a decision. 

The evidence of record provides sufficient information to adequately evaluate the claims. Therefore, no further assistance to the Veteran with the development of evidence is required, nor is there notice delay or deficiency resulting in any prejudice to the Veteran. 38 U.S.C.A. § 5103A(a)(2); 38 C.F.R. § 3.159(d); see Mayfield v. Nicholson, 19 Vet. App. 103 (2005), rev'd on other grounds, 444 F.3d 1328 (Fed. Cir. 2006).

II. Increased Ratings

Disability ratings are determined by applying the criteria set forth in the VA Schedule for Rating Disabilities (rating schedule), found in 38 C.F.R. Part 4. Disability ratings are intended to compensate impairment in earning capacity due to a service-connected disorder. 38 U.S.C.A. § 1155. Evaluation of a service-connected disorder requires a review of a veteran's entire medical history regarding that disorder. 38 C.F.R. §§ 4.1, 4.2 (2015); Schafrath v. Derwinski, 1 Vet. App. 589 (1991). When a reasonable doubt arises regarding the degree of disability, such doubt will be resolved in favor of the claimant. 38 C.F.R. § 4.3 (2015). If there is a question as to which evaluation to apply to the veteran's disability, the higher evaluation will be assigned if the disability picture more nearly approximates the criteria for that rating. Otherwise, the lower rating will be assigned. 38 C.F.R. § 4.7 (2015).

In Fenderson v. West, 12 Vet. App. 119 (1999), it was held that evidence to be considered in the appeal of an initial assignment of a disability rating was not limited to that reflecting the then current severity of the disorder. Cf. Francisco v. Brown, 7 Vet. App. 55, 58 (1994). In Fenderson, the Court also discussed the concept of the "staging" of ratings, finding that, in cases where an initially assigned disability evaluation has been disagreed with, it was possible for a Veteran to be awarded separate percentage evaluations for separate periods based on the facts found during the appeal period. Id. at 126-127.

When entitlement to compensation has already been established and an increase in the disability rating is at issue, the present level of disability is of primary concern. Francisco v. Brown, 7 Vet. App. 55 (1994). Nevertheless, in Hart v. Mansfield, 21 Vet. App. 505 (2007), the Court held that staged ratings are also appropriate for an increased rating claim that is not on appeal from the assignment of an initial rating when the factual findings show distinct time periods where the service-connected disability exhibited symptoms that would warrant different ratings.

The evaluation of the same disability under various diagnoses, known as pyramiding, is generally to be avoided. 38 C.F.R. § 4.14 (2015). The critical element in permitting the assignment of several ratings under various diagnostic codes is that none of the symptomatology for any one of the disabilities is duplicative or overlapping with the symptomatology of the other disability. See Esteban v. Brown, 6 Vet. App. 259, 261- 62 (1994).

A. Osteomyelitis (Residuals of a Left Tibia Injury)

The Veteran has claimed entitlement to an increased rating for residuals of a left tibia injury, to include osteomyelitis. This disability has been rated as 0 percent disabling prior to July 25, 2015, and as 20 percent disabling on and after that date pursuant to 38 C.F.R. § 4.71a, Diagnostic Code 5000 (2015).

Under Diagnostic Code 5000, for osteomyelitis, acute, subacute, or chronic, a 10 percent evaluation is assigned for inactive osteomyelitis following repeated episodes without evidence of active infection in the past 5 years. A 20 percent evaluation is assigned for osteomyelitis with discharging sinus or other evidence of active infection within the past 5 years. A 30 percent evaluation is assigned for osteomyelitis with definite involucrum or sequestrum, with or without discharging sinus. A 60 percent evaluation is assigned for frequent episodes of osteomyelitis with constitutional symptoms. A 100 percent evaluation is assigned for osteomyelitis of the pelvis, vertebrae, or extending into major joints, or with multiple localizations or with long history of intractability and debility, anemia, amyloid liver changes or other continuous constitutional symptoms. 38 C.F.R. § 4.71a.

Note (1) to Diagnostic Code 5000 provides that a rating of 10 percent, as an exception to the amputation rule, is to be assigned in any case of active osteomyelitis where the amputation rating for the affected part is 0 percent. This 10 percent rating and the other partial ratings of 30 percent or less are to be combined with rating for ankylosis, limited motion, nonunion or malunion, shortening etc., subject, of course, to the amputation rule. The 60 percent rating, as it is based on constitutional symptoms, is not subject to the amputation rule. A rating for osteomyelitis will not be applied following cure by removal or radical resection of the affected bone.

Note (2) to Diagnostic Code 5000 provides that the 20 percent rating on the basis of activity within the past 5 years is not assignable following the initial infection of active osteomyelitis with no subsequent reactivation. The prerequisite for this historical rating is an established recurrent osteomyelitis. To qualify for the 10 percent rating, two or more episodes following the initial infection are required. This 20 percent rating or the 10 percent rating, when applicable, will be assigned once only to cover disability at all sites of previously active infection with a future ending date in the case of the 20 percent rating.

Turning to the evidence of record, the Veteran underwent VA examinations in September 2006, March 2009, April 2012, December 2012, and September 2015.

The September 2006 VA examination report notes, in relevant part, that the Veteran described having sharp, localized pain two times per months, each time lasting for five hours. The pain is at level 5 on a scale of 1 to 10. It can be elicited by physical activity and relieved by rest and medication. It was noted that the bone condition is not currently infected, and that it was last infected in 1963. In terms of functional impairment, he has to limit walking.

The March 2009 VA examination report notes that the Veteran indicated he has no problems with the left lower leg. It was noted that he takes no medications for this disability, has not reported any joint problems or flare-ups, uses no braces or canes, and has had no further injury or surgery. It does not affect his daily activities or his employment. On examination, there was no tenderness or swelling at any aspect of the lower or upper leg. The examiner noted that the Veteran's osteomyelitis had apparently completely healed. The examiner noted that the only abnormality is the shortening of the left leg by 1 centimeter, but there were no lower extremity complaints associated with this abnormality.

A June 2009 VA medical record notes that the Veteran sought treatment for an old injury to the left lower leg. He has occasional pain and swelling of the left leg after working on his feet for hours. It was also noted to be painful in the early morning, and the leg seems to cramp up a lot. It was noted that the Veteran walks with use of a cane. On examination, his gait was slightly antalgic. His left lower leg was noted to have scars. There was no calf tenderness and good muscle tone. There were no tremors or abnormal movements. 

The April 2012 VA examination report notes that the Veteran reported there are no problems with his tibia. There were no symptoms, and he was taking no medication. He reported no flare-ups. It was opined that the Veteran's osteomyelitis did not impact his ability to work.

The December 2012 VA examination report notes that the Veteran has been diagnosed with degenerative joint disease of the left knee and with old healed fractures at mid-shaft of the tibia. The examiner also noted that the area of the left tibia fracture is tender. There is no further drainage, redness, or swelling. The Veteran denied flare-ups that impact the function of the knee and/or lower leg. It was noted that there was a deformity in the bone shaft, but there was no false joint, malunion, or nonunion. There were no signs of active infection or draining sinus. The Veteran was noted to be limited to standing for 15 to 30 minutes and was able to walk one fourth of a mile. It was noted that the Veteran did not report having flare-ups that impact the function of his lower leg. 

A July 2015 VA medical record notes that the Veteran has a remote history of left leg osteomyelitis and that he was presenting with several years of waxing and waning deep aching pain in the left leg. He reported that, on multiple occasions, the leg has swollen up and he gets drainage from the wound. He denied fever, cough, nausea, and vomiting. It notes that he has had chronic nerve pain from the injury and that he walks without assistance. He reported that he is not interested in having a surgery for the infection. He had a similar visit two years ago and has not had any problems since then. On examination, it was noted that the Veteran had a well-healed incision with no erythema or effusion and no active drainage. On x-ray, the left tibia showed a retained broken screw, a well-healed fracture, and no evidence of osteomyelitis. The assessment was that the Veteran had likely left tibia neuropathic pain with possible low grade infection from retained hardware. His doctor told the Veteran that he likely has an infection, given that he has had an infection before and gets intermittent drainage from the wound. He and the Veteran discussed definitive treatment for osteomyelitis. The Veteran would need new labs and removal of the broken screw, incision and debridement, and possible antibiotic beads.

The September 2015 VA examination report notes that the Veteran currently experiences recurrent infection of the distal tibia. It was noted that he has had recurrences of his infection in 1965, 2014, and 2015 that have involved chronic sinus drainage of the left distal tibia. On examination, the Veteran had tenderness to palpation below drainage sinus, and chronic erythema around the drainage sinus. The Veteran had discharging sinus but did not have involucrum or sequestrum. It was expressly noted that, at this time, the Veteran's condition is active. 

Based on the above, the Board finds that a compensable rating is not warranted prior to July 25, 2015, and a rating in excess of 20 percent is not warranted on and after that date. 

In order to receive a compensable rating, the Veteran's osteomyelitis must either be active or there must be evidence that it had been active within the prior five years. The contemporaneous VA examination and VA medical records dated prior to July 2015 show no active infection within the period. The Board notes that the September 2015 VA examination report reflects that the Veteran reported having had infections in 2014 and 2015. However, the Veteran's VA medical records from that period contain no reports of or treatment for osteomyelitis during that period. The Board notes that it is unclear whether the Veteran was diagnosed with an active infection in 2014, or whether he himself had concluded that he had had an active infection in 2014 based on his own lay observations. Indeed, for example, while the Veteran complained of pain, the physical examination in 2006 revealed that the bone condition was not currently infected. The Veteran's tibia was noted to be tender on VA examination in 2012, but there were no signs of active infection or draining sinus. Hence, given such history, while the Veteran believes he had an infection in 2014, the Board finds the fact that there is no contemporaneous evidence of such infection tends to suggest that the symptoms he attributes as due to an active infection are not due to an active infection. Thus, the Board finds no persuasive factually ascertainable evidence of infection until 2015. Therefore, the Board finds that a compensable rating is not warranted prior to July 25, 2015. 

Nor is a rating in excess of 20 percent warranted on and after July 25, 2015. The above evidence reflects that the Veteran sought treatment for an active infection in July 2015, and the current 20 percent rating is based on that infection. The assignment of a 30 percent rating would require the presence of definite involucrum or sequestrum, both of which were expressly not found during the September 2015 VA examination. The assignment of a 60 percent rating would require frequent episodes of osteomyelitis with constitutional symptoms, neither of which is indicated by the record. Finally, none of the symptoms listed in the 100 percent rating criteria are even suggested by the record. Therefore, a rating in excess of 20 percent is not warranted under Diagnostic Code 5000 on and after July 25, 2015. 

The Board has considered whether separate ratings (other than for the scar, which will be discussed below) are warranted for the Veteran's osteomyelitis at any point during this appeal. The Board finds, however, that no such ratings are warranted. As will be discussed in detail below, the Veteran's left knee disability is not related to his osteomyelitis. Therefore, no rating that is associated with left knee impairment is warranted. The only other manifestation of disability that is identified in the record is for neuropathic pain, which was noted in the July 2015 VA medical record.

As noted above, the July 2015 VA medical record assesses the Veteran has having likely left tibia neuropathic pain with possible low grade infection from retained hardware. The Board notes, however, that the July 2015 record only contains an assessment of "likely" neuropathic pain, not an actual diagnosis. There are no other such reports in the record. The September 2015 VA examination report reflects that the Veteran did not report neuropathic pain when describing his symptoms. Furthermore, neuropathic pain is not noted in the section of the VA examination report that lists the Veteran's symptoms. This section notes that the Veteran has discharging sinus, tenderness, and erythema, and nothing is listed on the line for "[o]ther symptoms, describe." In light of the above, the Board finds that a separate compensable rating for nerve impairment is not warranted.

In so finding all of the above, the Board notes that the Veteran is competent to report on symptoms and credible to the extent that he believes he is entitled to a higher rating for his disability. His competent and credible lay evidence, however, is outweighed by competent and credible medical evidence that evaluates the true extent of the impairment based on objective data coupled with the lay complaints. In this regard, the Board notes that the VA examiners have the training and expertise necessary to administer the appropriate tests for a determination of the type and degree of the impairment associated with the Veteran's complaints. For these reasons, greater evidentiary weight is placed on the examination findings in regard to the type and degree of impairment. 

The Board has also considered the doctrine of reasonable doubt. However, as the preponderance of the evidence is against this claim, the doctrine is not for application. Gilbert v. Derwinski, 1 Vet. App. 49 (1990). Accordingly, entitlement to a compensable rating for residuals of a left tibia injury, to include osteomyelitis, prior to July 25, 2015, and entitlement to a rating in excess of 20 percent on and after that date, must be denied.

B. Scar on the Distal Left Tibia

The Veteran has also claimed entitlement to an increased rating for a scar on the distal left tibia. This disability is rated as 0 percent disabling prior to July 25, 2015, and as 20 percent disabling on and after that date.

The Board notes that the regulations pertaining to rating skin disabilities were revised effective October 23, 2008. However, those revised provisions are applicable only to claims received on or after October 23, 2008. Because the current claim was received prior to that date, those revisions do not apply in this case. 73 Fed. Reg. 54708 (Sept. 23. 2008). Nonetheless, given that the RO has evaluated the severity of his disability pursuant to these criteria, the Board will evaluate the Veteran's skin disability under both the old and the new rating criteria. 

The Board notes, however, that VA cannot apply the revised regulations for any date prior to the change in the regulations. Thus, the Board may consider only the former version of the regulations prior to October 23, 2008.

The Veteran has claimed entitlement to an increased rating for a scar on the distal left tibia. This disability is rated as 0 percent disabling prior to July 25, 2015, and as 20 percent disabling on and after that date. The noncompensable rating was assigned under the older rating criteria of 38 C.F.R. § 4.118, Diagnostic Code 7804 (prior to October 23, 2008). This version of Diagnostic Code 7804 assigned a 10 percent rating for scars that were superficial and painful on examination. 

Effective October 23, 2008, unstable or painful scars are rated under revised rating criteria of Diagnostic Code 7804. These new criteria assign a 10 percent rating for one or two unstable or painful scars, a 20 percent rating for three or four unstable or painful scars, and a 30 percent rating for five or more unstable or painful scars. Note (1) to this diagnostic code defines an unstable scar as one where there is frequent loss of covering of skin over the scar. Note (2) directs that an additional 10 percent be added to the evaluation if one or more scars are both unstable and painful. Note (3) provides that scars evaluated under Diagnostic Codes 7800, 7801, 7802, or 7805 may also receive an evaluation under Diagnostic Code 7804, when applicable. 

The September 2006 VA examination report notes that the Veteran has a depressed scar on the lower left medial leg measuring about 12.5 centimeters by 0.5 centimeters with tenderness, disfigurement, and hypopigmentation of more than six square inches. There was no ulceration, adherence, instability, tissue loss, inflammation, edema, keloid formation, hyperpigmentation, and abnormal texture. Significant tenderness was noted over the scar area on examination, and it was noted that there is deformity over the scar with elevation over the superior portion of the scar followed by depression. 

The April 2012 VA examination report notes that the Veteran has surgical scars related to the osteomyelitis treatment. These scars were noted to not be painful and/or unstable, and the total area of all related scars was not greater than 39 square centimeters.

The December 2012 VA examination report notes that the Veteran has surgical scars that were noted to not be painful and/or unstable, and the total area of all related scars was not greater than 39 square centimeters. He does, however, have a left distal scar that is well-healed but a little sensitive. 

A July 2015 VA medical record notes that the Veteran's scar is mildly tender to palpation.

The September 2015 VA examination report notes that the Veteran has scars but that none of the scars is painful and/or unstable, and the total area of all related scars is not greater than 39 square centimeters. 

Based on the above, the Board finds that entitlement to a rating of 10 percent, but no higher, is warranted under the older rating criteria prior to October 23, 2008. The Board also finds that a rating of 10 percent, but no higher, is warranted under either the older or the current rating criteria from October 23, 2008, through July 25, 2015. The Board also finds that a rating in excess of 20 percent is not warranted under either the older or the current rating criteria on and after July 25, 2015.

i. Prior to October 23, 2008

First, with respect to the period prior to October 23, 2008, the Board notes that the evidence reflects that significant tenderness was noted over the scar area on examination. The September 2006 VA examination report notes only the single scar, and there is no contention or indication that more than one scar is present. The presence of one painful scar warrants a 10 percent rating under Diagnostic Code 7804. This is the maximum schedular rating that is available under Diagnostic Code 7804. 

The Board has also considered whether separate or higher ratings may be assigned under the other applicable diagnostic codes. Specifically, prior to October 23, 2008, scars were evaluated under 38 C.F.R. § 4.118, Diagnostic Codes 7800 through 7805. 

Of the old rating criteria, the Board need not consider Diagnostic Code 7800, which only applied to disabilities of the head, face, and neck. Because the Veteran's scar was not deep (i.e., manifested by underlying soft tissue damage), Diagnostic Code 7801 is not applicable. Because the Veteran's scar did not cover an area exceeding 929 square centimeters, a separate compensable rating was not available under Diagnostic Code 7802. Because the Veteran's scar was not superficial and unstable, a separate compensable rating was not warranted under Diagnostic Code 7803. Nor may an increased rating be assigned based on limitation of function under Diagnostic Code 7805, as the evidence of record reflects that there was no functional impairment attributable to the scar. Thus, a rating in excess of 10 percent, to include under a separate compensable rating, may not be assigned based on any of the old rating criteria that are applicable to scarring.

ii. From October 23, 2008, through July 24, 2015

Turning to the period from October 23, 2008, through July 24, 2015, the Board finds that a rating in excess of 10 percent is not warranted under the old rating criteria for the same reasons that were discussed above in relation to the period prior to October 23, 2008. The evidence of record from this period is consistent with that from the earlier period. Specifically, the 10 percent rating under the older Diagnostic Code 7804 is appropriate for a single painful scar. None of the conditions for assigning a compensable rating under Diagnostic Codes 7800 through 7803 and 7805 are satisfied for this period. Therefore a rating in excess of 10 percent is not warranted under the older rating criteria for the period from October 23, 2008, through July 24, 2015.

Nor is an increased rating warranted under the current rating criteria.

Effective October 23, 2008, unstable or painful scars are rated under revised rating criteria of Diagnostic Code 7804. These new criteria assign a 10 percent rating for one or two unstable or painful scars, a 20 percent rating for three or four unstable or painful scars, and a 30 percent rating for five or more unstable or painful scars. Note (1) to this diagnostic code defines an unstable scar as one where there is frequent loss of covering of skin over the scar. Note (2) directs that an additional 10 percent be added to the evaluation if one or more scars are both unstable and painful. Note (3) provides that scars evaluated under Diagnostic Codes 7800, 7801, 7802, or 7805 may also receive an evaluation under Diagnostic Code 7804, when applicable. 

A rating in excess of the 10 percent rating that has now been assigned under the older Diagnostic Code 7804 is not available under the current Diagnostic Code 7804. Specifically, the single painful scar is assigned a 10 percent rating, and no additional painful scars have been found on examination. As indicated above, an additional 10 percent rating is assigned when one or more scars is both painful and unstable. The evidence from this period expressly notes that the Veteran's scar is not unstable. Therefore, an additional 10 percent rating for an unstable and painful scar is not warranted under Diagnostic Code 7804. 

The Board notes that the rating code revisions eliminated Diagnostic Code 7803 and incorporated it into Diagnostic Code 7804. Because, however, the revised rating criteria of Diagnostic Code 7804 allow the assignment of separate ratings under Diagnostic Codes 7800, 7801, 7802, or 7805, even when the Veteran is in receipt of a compensable rating under Diagnostic Code 7804, the Board must consider whether a separate, compensable rating is warranted under an additional diagnostic code pertaining to the rating of scars. 38 C.F.R. § 4.118, Diagnostic Code 7804, Note (3) (effective October 23, 2008).

The current Diagnostic Code 7800 is not applicable in this case, as it applies to scars on the head, face, or neck. A separate compensable rating is not warranted under the current Diagnostic Code 7801, as the Veteran's scar is not deep. Because the Veteran's scar does not cover an area of at least 929 square centimeters, a separate compensable rating is not warranted under the current Diagnostic Code 7802. Because the Veteran's scar itself does not cause other disabling effects (any additional disability is reflected in the osteomyelitis rating that is discussed above), a separate rating pursuant to Diagnostic Code 7805 is not warranted.

iii. From July 25, 2015

Turning to the period beginning on July 25, 2015, the Board finds that a rating in excess of 20 percent is not warranted under either the old or the new rating criteria

With respect to the old rating criteria, in the absence of at least three painful scars, ratings totaling at least 30 percent are not warranted. Diagnostic Code 7800 again is inapplicable, as it pertains to scars on the head, face, and neck. The evidence again reflects that the Veteran's scar is not deep and, therefore, Diagnostic Code 7801 does not apply. Because the Veteran's scar does not cover at least 929 square centimeters, a separate compensable rating under Diagnostic Code 7802 is not warranted. 

Because the Veteran's scar is not superficial and unstable, a separate compensable rating is not warranted. The Board notes that the Veteran was assigned an additional 10 percent rating, for a total of 20 percent, under the current Diagnostic Code 7804 based on the finding that his scar is both painful and unstable. The Board notes however, that the relevant evidence of record does not indicate instability. Specifically, the July 2015 VA medical record notes that the scar was tender to palpation but makes no comment on instability. The September 2015 VA examination report expressly notes that none of the Veteran's scars is unstable. The Board can find no contradictory evidence of instability in the record. In light of the above, the Board finds that the criteria for a 10 percent rating under Diagnostic Code 7803 are not met. 

Again, no functional limitation has been attributed specifically to the Veteran's scar, and any functional limitation associated with the Veteran's osteomyelitis is expressly compensated under Diagnostic Code 5000. Therefore, the Board finds that a separate rating under Diagnostic Code 7805 is not warranted.

Turning to the current rating criteria, as noted above, compensable ratings are not warranted under Diagnostic Code 7800, 7801, 7802, and 7805 for the same reasons that such ratings were not assigned under the former rating criteria. A rating in excess of 20 percent is not warranted under Diagnostic Code 7804 in the absence of three or four scars that are painful or unstable, with at least one of these scars being both unstable and painful. Alternatively, in the absence of at least five unstable or painful scars, with or without at least one of these scars being painful and unstable, a rating in excess of the current 20 percent is not warranted. 

The Board has considered whether entitlement to ratings even higher than those assigned herein are warranted. However, the Board finds that the preponderance of the evidence is against the assignment of even higher ratings. Therefore, the doctrine is not for application. Gilbert v. Derwinski, 1 Vet. App. 49 (1990). Accordingly, entitlement to a rating in excess of 10 percent for a scar on the distal left tibia prior to July 25, 2015, and a rating in excess of 20 percent on and after that date must be denied.

C. Extraschedular Evaluations

In reaching these conclusions, the Board also has considered whether the Veteran is entitled to an increased level of compensation for the disabilities at issue on an extraschedular basis. Ordinarily, the VA Schedule will apply unless there are exceptional or unusual factors that would render application of the schedule impractical. See Fisher v. Principi, 4 Vet. App. 57, 60 (1993).

According to the regulation, an extraschedular disability rating is warranted based upon a finding that the case presents such an exceptional or unusual disability picture with such related factors as marked interference with employment or frequent periods of hospitalization that would render impractical the application of the regular schedular standards. See 38 C.F.R. § 3.321(b)(1) (2015); see also Fanning v. Brown, 4 Vet. App. 225, 229 (1993).

Under Thun v. Peake, 22 Vet App 111 (2008), there is a three-step inquiry for determining whether a veteran is entitled to an extraschedular rating. First, the Board must first determine whether the evidence presents such an exceptional disability picture that the available schedular evaluation for the service-connected disability is inadequate. Second, if the schedular evaluation does not contemplate the Veteran's level of disability and symptomatology and is found inadequate, the Board must determine whether the Veteran's disability picture exhibits other related factors such as those provided by the regulation as "governing norms." Third, if the rating schedule is inadequate to evaluate a veteran's disability picture and that picture has attendant thereto related factors such as marked interference with employment or frequent periods of hospitalization, then the case must be referred to the Under Secretary for Benefits or the Director of the Compensation and Pension Service to determine whether, to accord justice, the Veteran's disability picture requires the assignment of an extraschedular rating.

With respect to the first prong of Thun, the evidence in this case does not show such an exceptional disability picture that the available schedular evaluations for the Veteran's service-connected residuals of a left tibia injury, to include osteomyelitis, and scar are inadequate. A comparison between the level of severity and symptomatology of the Veteran's disabilities with the established criteria shows that the rating criteria reasonably describe the Veteran's disability level and symptomatology. 

Specifically, the Board finds that the rating criteria for the Veteran's left tibia injury, to include residual osteomyelitis, adequately contemplate the level of impairment that is demonstrated in the evidence of record. As noted above, osteomyelitis ratings are based on the proximity in time to when the Veteran last had an active infection. The rating criteria of Diagnostic Code 5000 include provisions for symptoms such as "other evidence of active infection" or "constitutional symptoms" that are not specifically defined. The broadness of these rating criteria allow for consideration of all of the Veteran's symptoms, regardless of whether they are specifically identified by the rating criteria. 

Likewise, the Board finds that the rating criteria for disabilities of the skin contemplate all of the Veteran's reported symptomatology. Specifically, provisions in both the old and the new criteria allow the assignment of ratings based on deepness, limitation of motion, size, instability, pain, and other effects (including functional impairment). The Veteran has not identified any symptoms caused by his scarring that cannot fit into any of these categories.

In short, the disabilities in the case at hand are not characterized by any additional complaints or symptoms that are not contemplated by applicable rating criteria under which the Veteran already receives compensation. 

As the Board finds that the Veteran's disability picture is contemplated by the rating schedule, the inquiry ends and the Board need not consider whether the disability picture exhibits other related factors such as marked interference with employment and frequent periods of hospitalization. The Board, therefore, has determined that referral of this case for extraschedular consideration pursuant to 38 C.F.R. § 3.321(b)(1) is not warranted.

The Board notes that under Johnson v. McDonald, 762 F.3d 1362 (Fed. Cir. 2014), a Veteran may be awarded an extraschedular rating based upon the combined effect of multiple conditions in an exceptional circumstance where the evaluation of the individual conditions fails to capture all the service-connected disabilities experienced. However, in this case, there are no additional service-connected disabilities that have not been attributed to a specific service-connected condition. Accordingly, this is not an exceptional circumstance in which extraschedular consideration may be required to compensate the Veteran for a disability that can be attributed only to the combined effect of multiple conditions. 

The Board has also considered the decision of the United States Court of Appeals for Veterans Claims (Court) in Rice v. Shinseki. In that case, the Court held that a request for a total disability rating based on individual unemployability due to service-connected disabilities (TDIU), whether expressly raised by a veteran or reasonably raised by the record, is not a separate claim for benefits, but is rather part of the adjudication of a claim for increased compensation (whether in an original claim or as part of a claim for increased rating). Rice v. Shinseki, 22 Vet. App. 447 (2009). Here, the Veteran has not claimed that he is unemployable due to the residuals of his left distal tibia injury, to include osteomyelitis, and his left tibia scar, and the evidence of record does not otherwise suggest that this is the case. Therefore, consideration of a TDIU is not warranted. 

III. Service Connection

Service connection is warranted where the evidence of record establishes that a particular injury or disease resulting in disability was incurred in the line of duty in the active military service or, if pre-existing such service, was aggravated thereby. 38 U.S.C.A. §§ 1110, 1131 (West 2014); 38 C.F.R. § 3.303(a) (2015).

To establish a right to compensation for a present disability, a veteran must show (1) the existence of a present disability; (2) in-service incurrence or aggravation of a disease or injury; and (3) a causal relationship, or nexus, between the present disability and the disease or injury incurred or aggravated during service. Shedden v. Principi, 381 F.3d 1163, 1167 (Fed. Cir. 2004).

Service connection may also be granted for chronic disabilities, such as arthritis, hypertension, cardiovascular-renal disease, and psychosis, if such are shown to have been manifested to a compensable degree within one year after the veteran was separated from service. 38 U.S.C.A. §§ 1101, 1112, 1113, 1137; 38 C.F.R. §§ 3.307, 3.309. In such instances, service connection may be established based on a continuity of symptomatology from the time of manifestation. See Walker v. Shinseki, 708 F.3d 1331 (Fed. Cir. 2013) (holding that the theory of continuity of symptomatology can be used only in cases involving those conditions explicitly recognized as chronic 38 C.F.R. § 3.309(a)).

A disability which is proximately due to, or results from, another disease or injury for which service connection has been granted shall be considered a part of the original condition. 38 C.F.R. § 3.310(a) (2015). Secondary service connection on the basis of aggravation is permitted under 38 C.F.R. § 3.310(b), and compensation is payable for that degree of aggravation of a non-service-connected disability caused by a service-connected disability and not due to the natural progress of the nonservice-connected disease. Allen v. Brown, 7 Vet. App. 439 (1995).

A. Left Leg Disability

The Veteran has claimed entitlement to service connection for a left leg disability, to include as secondary to his service-connected residuals of a left tibia injury, to include osteomyelitis. Specifically, the Veteran has claimed this issue as "[a]rthritis, left leg." 

In terms of a current disability, arthritis of the left knee is the only current disability of the left lower extremity that appears in the medical evidence of record that is not encompassed by the service-connected residuals of a left tibia injury. All other disabilities of the left lower extremity, including arthritis of the left leg other than in the left knee, must be denied due to the absence of a current disability. See Brammer v. Derwinski, 3 Vet. App. 223 (1992). 

The Board will therefore turn its attention to the question of whether the Veteran has arthritis of the left knee that is related to service or to a service-connected disability. 

The Veteran's service treatment records reflect that his lower extremities were clinically normal when examined at the time of his September 1963 enlistment examination. His June 1966 separation examination report notes clinical abnormality of the lower extremities, specifically noting scars of the left anterior tibial region from intermittent draining of chronic osteomyelitis. It was noted that the Veteran had "chronic osteomyelitis of left tibia with a 3 profile." There is no separation medical history report of record. He reported on a September 1966 statement of medical examination that there has been no change in his medical condition since he underwent his separation medical examination. A September 1964 service treatment record summarizes the Veteran's history of having sustained a compound fracture of his distal left tibia in 1957 prior to service, which was treated with internal fixation by two screws. He reported that he had intermittent drainage from the site for the next two years but had no difficulty for the next four years. He reported that he bumped his leg in basic training, and it became red and inflamed and is painful. On examination, x-ray of the left leg showed a healed fracture of the distal third of the tibia and fibula. The Veteran did not respond to conservative treatment and continued to report experiencing pain. 

The Veteran underwent a VA examination in connection with his osteomyelitis in September 2006, at which time his left knee was examined. On examination, flexion was to 140 degrees and extension was to 0 degrees. Joint function was not additionally limited by pain, fatigue, weakness, lack of endurance, or incoordination after repetitive use. The anterior and posterior cruciate ligaments stability test, the medial and lateral collateral ligaments stability test, and the medial and lateral meniscus test were within normal limits. In the diagnosis section, the examiner noted that range of motion and appearance of the knee were within normal limits and gave no left knee diagnosis. 

The March 2009 VA examination report reflects that the Veteran's left knee was examined and no diagnosis was rendered. It notes that he has not reported any joint problems or flare-ups, uses no braces or canes, and has had no further injury or surgery. It does not affect his daily activities or his employment. On examination, knee flexion and extension were full. Repetitive movement produced no indication of pain, weakness, or fatigue. The examiner provided no left knee diagnosis. 

The April 2012 VA examination report notes that, on examination, left knee flexion and extension were full with no objective evidence of painful motion, and flexion and extension were full after repetitive motion. The Veteran had no additional limitation of range of motion following repetitive-use testing. The Veteran had no functional loss, functional impairment, or additional limitation of range of motion of the knee after repetitive use. There was no tenderness or pain to palpation for the joint line or soft tissue of the knee. Muscle strength was full, and stability testing was normal. There was no evidence or history of recurrent patellar subluxation/dislocation. There was no genu recurvatum, and the Veteran has not had any meniscal conditions. 

The December 2012 VA examination report notes that the Veteran has been diagnosed with degenerative joint disease of the left knee. The Veteran denied flare-ups of the left tibia fracture that impact the function of the knee and/or lower leg. Flexion was to 135 degrees with no objective evidence of painful motion. Extension was full with no objective evidence of painful motion. The Veteran was able to perform repetitive use with no additional limitations. The Veteran did not have any functional loss, functional impairment, or additional limitation of range of motion after repetitive use. The Veteran did not have tenderness or pain to palpation for the joint line or soft tissue of the left knee. Muscle strength was full, and joint stability tests were normal. There was no evidence or history of recurrent patellar subluxation/dislocation. The Veteran has had no meniscal conditions. It was noted that there was a deformity in the bone shaft, but there was no false joint, malunion, or nonunion. There were no signs of active infection or draining sinus. The Veteran was noted to be limited to standing for 15 to 30 minutes and was able to walk one fourth of a mile. It was noted that the Veteran did not report having flare-ups that impact of the function of his lower leg. A left knee radiology report notes an impression of moderate joint space narrowing of the medial tibiofemoral compartment consistent with osteoarthritis. 

The VA examiner opined that the Veteran's disability is less likely than not proximately due to or the result of the Veteran's service-connected condition. Her rationale was that the Veteran's degenerative joint disease of the left knee was related to the aging process. 

The probative value of medical opinion evidence is based on the medical expert's personal examination of the patient, his or her knowledge and skill in analyzing the data, and his or her medical conclusion. As is true with any piece of evidence, the credibility and weight to be attached to these opinions are within the province of the adjudicator. Guerrieri v. Brown, 4 Vet. App. 467, 470-71 (1993). Whether a physician provides a basis for his or her medical opinion goes to the weight or credibility of the evidence in the adjudication of the merits. See Hernandez-Toyens v. West, 11 Vet. App. 379, 382 (1998). Other factors for assessing the probative value of a medical opinion are the physician's access to the claims folder and the thoroughness and detail of the opinion. See Prejean v. West, 13 Vet. App. 444, 448-9 (2000).

The Board notes that the December 2012 VA examination report is the only competent evidence of record that opines on the etiology of the Veteran's left knee arthritis. The Board finds that this opinion is probative in that the author of this opinion is a physician who is qualified through education, training, or experience to provide competent medical evidence under 38 C.F.R. § 3.159(a)(1). See Cox v. Nicholson, 20 Vet. App. 563 (2007). Her examination report reflects that she reviewed the claims file, and she obtained a history from the Veteran. In rendering her opinion, she essentially noted that the Veteran's left knee arthritis was not at least as likely as not related to service or service connected disability and she provided the explanation that offered a more likely etiology. While the December 2012 VA examiner did not specifically use the term "aggravation", the Board finds that the rationale used by the December 2012 examiner indicating that the Veteran's degenerative joint disease was related to the aging process is broad enough to indicate that there was neither causation nor aggravation. In El-Amin v. Shinseki, 26 Vet. App. 136 (2013), the Court considered the possibility that language in a medical opinion could be considered to address aggravation without specifically using that word, but rejecting the argument on the facts of that case. In Kittrell v. Shinseki, No. 08-3001, 2010 WL 4671873 (Vet. App. Nov. 10, 2010) (mem. dec., Moorman, J.), the Court addressed the argument that a medical opinion was inadequate because it was not stated in the precise terms found in 38 C.F.R. § 3.310. The Court rejected this argument, and held: "It is not required that a medical opinion regarding secondary service connection be stated in the precise terms found in § 3.310 to be considered adequate. To the contrary, this Court has emphasized that a physician's choice of language is not error where, as here, his opinion is unambiguous and sufficient to comply substantially with the purpose for which it was sought." Id. at *2 (citing Dyment v. West, 13 Vet.App. 141, 146-47 (1999)). The Court also held that the Board's decision relying on this opinion was not rendered inadequate "simply because the examiner did not use the 'magic words' of proximate causation." Id. The Court's decision was affirmed by the Federal Circuit and the Board finds its reasoning persuasive. See Kittrell v. Shinseki, No. 2011-7102, 464 Fed. Appx. 902, 2012 WL 884871 (Fed. Cir. Feb 17, 2012) (unpublished); see also Bethea v. Derwinski, 2 Vet. App. 252, 254 (1992) (single judge decisions may be relied upon for any persuasiveness or reasoning they contain). Consequently, the lack of specific reference to aggravation does not render the December 2012 VA examiner's opinion inadequate. As the Veteran's arthritis is consistent with the natural progress of aging, a reasonable inference can be made that the degenerative process affecting his knee has not been accelerated (i.e., aggravated) beyond what would be expected in an individual without osteomyelitis. For these reasons, the Board finds that the December 2012 VA examination report is the most probative evidence of record. 

The Board acknowledges that the Veteran himself believes that his current left knee arthritis is related to the in-service injury. The Board recognizes that there are instances in which lay testimony can provide probative evidence in medical matters. A layperson may be competent to offer testimony on certain medical matters, such as describing symptoms observable to the naked eye, or even diagnosing simple conditions. See Jandreau v. Nicholson, 492 F.3d 1372 (Fed. Cir. 2007). In the case at hand, the Veteran is competent to describe experiencing left knee symptoms. The Board finds, however, that the question of whether the Veteran has a current left knee disability that is etiologically related to an injury to the distal left tibia is of such complexity as to require that the individuals who provide competent medical evidence on this matter must possess a level of expertise that a layperson simply does not possess. 

The Veteran has submitted an article on osteomyelitis that, as he asserts in his June 2009 substantive appeal, provides medical evidence that "suggests my service-connected osteomyelitis could affect many other issues I suffer, including those listed on this appeal." The Board notes that the literature that he submitted reflects that, when it spreads, the osteomyelitis causes infection of the bone or "can also spread outward from the bone to form collections of pus (abscesses) in adjacent soft tissue, such as the muscle." It notes that "[b]ones, which usually are well protected from infection, can become infected through three routes: The bloodstream (which may carry an infection from another part of the body to the bones)[,] [d]irect invasion (infection)[,] [i]nfections in adjacent bone or soft tissues." The Board cannot grant the Veteran's claim based on this article for two reasons.

First, the Board notes that the literature at issue specifically states that osteomyelitis, which "is a bone infection," can spread to cause infection in adjacent bone and tissues or in other parts of the body. It does not identify any additional disabilities that result from osteomyelitis. In the case at hand, the Veteran has not been found to have an infection in his left knee, either in the bone or in the muscles. Rather, he has arthritis. Thus, an article discussing the manners in which osteomyelitis may spread to the Veteran's adjacent bone and muscles is not applicable to this claim.

Second, the Board notes that, even if the Veteran were to have been found to have a left knee infection, the article at issue merely asserts that "bacteria or fungi can infect bones by spreading through the bloodstream, spreading from nearby tissue, or directly invading the bone." [Emphasis added.] It also lists ways in which the bone "may" become infected. Remaining statements in this article are couched in similarly speculative language. Such assertions are far too speculative to probatively support the Veteran's contentions. See Bostain v. West, 11 Vet. App. 124, 127- 28, quoting Obert v. Brown, 5 Vet. App. 30, 33 (1993) (medical opinion expressed in terms of "may" also implies "may or may not" and is too speculative to establish medical nexus); Warren v. Brown, 6 Vet. App. 4, 6 (1993) (doctor's statement framed in terms such as "could have been" is not probative). Therefore, this article is too speculative to provide probative evidence in support of the Veteran's claim.

The Board will now address whether service connection is warranted for a left knee disability on a presumptive basis. As noted above, service connection may be granted for chronic disabilities, such as arthritis, if such are shown to have been manifested in service or manifested to a compensable degree within one year after the Veteran was separated from service. 38 U.S.C.A. §§ 1101, 1112, 1113, 1137; 38 C.F.R. §§ 3.307, 3.309. The case of Walker v. Shinseki, 708 F.3d 1331(Fed. Cir. Feb. 21, 2013), elaborates on situations in which presumptive service connection may be granted for chronic disabilities.

The first applicable situation is that in which a chronic disease is "shown in service (or within the presumptive period under § 3.307)." Walker, 708 F.3d at 1335. According to Walker, "[t]he regulation equates 'shown in service' with a reliable diagnosis of the chronic disease while in service.... To be 'shown in service,' the disease identity must be established and the diagnosis not be subject to legitimate question." Id.

In the case at hand, the Board notes that the Veteran has a current diagnosis of degenerative joint disease of the left knee. There is no medical evidence of left knee degenerative joint disease, specifically, either in service or within one year of separation therefrom. Therefore, the Board finds that the Veteran's left knee degenerative joint disease was not "shown in service" as contemplated by the regulations. 

Alternatively, under Walker, continuity of symptomatology may be used in place of nexus "[i]f evidence of a chronic condition is noted during service or during the presumptive period, but the chronic condition is not 'shown to be chronic, or where the diagnosis of chronicity may be legitimately questioned,' i.e., 'when the fact of chronicity in service is not adequately supported.'" Walker, 708 F.3d at 1336. According to Walker, "[t]he natural reading of the 'condition' noted in service is a condition indicative of a chronic disease, but not sufficiently indicative to demonstrate that the chronic disease is 'shown to be chronic.'" Id. at 1339. Walker also states that "in the situation where the veteran cannot establish a chronic disease 'shown' in the presumptive period for purposes of § 3.303(b) but can point to a chronic condition that was noted in the presumptive period but the notation was insufficient to support a diagnosis beyond legitimate question ... the veteran can benefit from continuity of symptomatology to establish service connection ...."

The Board finds that the case at hand does not contain evidence of a chronic condition noted in service or within the presumptive period in which "the notation was insufficient to support a diagnosis beyond legitimate question." Again, the Board notes that there is no notation of degenerative joint disease of the left knee in service, and there is no evidence of left knee degenerative joint disease in service or to a degree of 10 percent or more within one year of separation from service to allow for the Veteran to establish service connection for left knee degenerative joint disease through lay reports of continuity of symptomatology. In addition, the Veteran does not possess the necessary professional expertise to diagnose degenerative joint disease of the left knee in service, and he thus cannot provide competent "evidence of a chronic condition [that] is noted during service or during the presumptive period, but the chronic condition is not 'shown to be chronic, or where the diagnosis of chronicity may be legitimately questioned.'" Therefore, service connection for left knee degenerative joint disease based on continuity of symptomatology is neither available nor warranted.

In short, the Board finds that the preponderance of the evidence is against granting service connection for a left leg disability, to include as secondary to service-connected osteomyelitis of the left leg. The Board has considered the doctrine of reasonable doubt; however, as the preponderance of the evidence is against the appellant's claim, the doctrine is not for application. Gilbert v. Derwinski, 1 Vet. App. 49 (1990). Accordingly, the claim must be denied.

B. Cervical Spine Disability

The Veteran has claimed entitlement to service connection for a cervical spine disability, to include as secondary to his service-connected residuals of a left tibia injury, to include osteomyelitis. Specifically, the Veteran contends that he suffered a neck injury in service when he was hit over the head with a club, but that he never sought treatment for this injury. 

The Veteran's service treatment records reflect that his spine was clinically normal when examined at his September 1963 enlistment examination. He denied a history of, or current, arthritis on his September 1963 medical history report. His June 1966 separation medical history report reflects that his spine was clinically normal on examination, and he denied any change in his condition since the separation examination on a September 1966 statement of medical examination. Otherwise, his service treatment records reflect that he never complained of, or sought treatment for, symptoms in connection with a neck disability. 

In terms of a current disability, the December 2012 VA examination report notes that the Veteran was diagnosed with cervical disc disease in the 2000s. 

Following the Veteran's separation from service, a September 1987 VA medical record notes that he sought treatment for aching pain in the neck and shoulders and throbbing headaches. It was noted that all symptoms had started approximately six days earlier. 

An August 1988 VA medical record notes that the Veteran reported having been hit on the head with a steel rack on a truck in 1987. He sought treatment and was diagnosed with a "neck injury (spurs)." 

A March 1989 VA medical record notes that the Veteran was requesting more Ibuprofen for upper back and neck pain. 

A July 1993 VA mental hygiene clinic record notes that the Veteran suffered a head injury in 1987 when he hit his head on a metal rod. 

A November 1993 VA radiology report notes an impression of severe degenerative disc disease between C5 and C6 with posterior and bilateral oblique spurs at that level. There was also similar but less disease between C4 and C5. There was partial loss of the lordotic curve, suggesting of muscle spasm. 

A July 1994 VA examination report notes that the Veteran reported that, while he was in service in 1963, he was assaulted and hit on the head with a club by another soldier during back training. He reported that he had no evaluation or treatment at that time. Approximately 10 to 12 years ago (which would have been approximately 10 years after service), he started developing discomfort and pain in the neck. He was seen by a chiropractor and x-rays demonstrated bony spurs. The Veteran stated that it hurts to turn his head laterally, to turn his head to the right, and to elevate the head. Following physical examination, the examiner provided an assessment of neck pain, etiology unknown, rule out degenerative joint disease. A July 1994 x-ray report noted an impression of some degenerative changes with osteophytes in C3, 4, 5, and C6 vertebral bodies, as well as narrowing of intervertebral disc spaces and intervertebral foramen, especially on the right side in C5-6. 

The December 2012 VA examination report notes that the Veteran reported having had an onset of neck problems in basic training and he was on profile. He took conservative therapy, recalling the use of Darvon. After service, he notes that he had neck discomfort due to the use of a protective hat at work a few years ago. It was noted that the Veteran "has been on [disability] for more than two decades but he is not specific for which situation or [if] he had [a] work accident." He reported his neck condition worsened and he sought medical attention that year. He was diagnosed with arthritis. He reported having posterior neck pain and spasm and limited motion. There were no neurologic complaints. A radiology report lists an impression of moderate degenerative changes demonstrated at the C3-4 through C6-7 levels. 

Following review of the claims file and interview and examination of the Veteran, the December 2012 VA examiner opined that the Veteran's neck disability was less likely than not incurred in or caused by the claimed in-service injury, event, or illness. Her rationale was that there is no evidence of any neck injury in the medical records or any chronic neck problem in service or following separation. She opined that the current problem is related to the aging process and genetic predisposition. She also opined that the Veteran's cervical spine disability is less likely as not proximately due to or the result of this service connected left tibia with osteomyelitis disability. In her rationale, she noted that there is no link between distal osteomyelitis or a tibia condition with the development of a neck condition. 

Based on the above, the Board finds that a preponderance of the evidence of record weighs against finding an etiological link between the Veteran's current neck disability and his military service, to include his service-connected residuals of a left tibia injury, to include osteomyelitis. As noted above, the VA examination was conducted by a physician who is qualified through education, training, or experience to provide competent medical evidence under 38 C.F.R. § 3.159(a)(1). See Cox v. Nicholson, 20 Vet. App. 563 (2007). As indicated above, this examination report reflects review of the claims file and interview and examination of the Veteran. In rendering her opinion, she noted that the Veteran's neck disability was not at least as likely as not related to service and supported her conclusion with citation to evidence in the record. Also, she indicated that the Veteran's cervical spine disability is less likely as not proximately due to or the result of the service connected left tibia disability based on sound medical principles. While the December 2012 VA examiner did not specifically use the term "aggravation", the Board finds that the rationale used by the December 2012 examiner indicating that the Veteran's current problem was related to the aging process and genetic predisposition is broad enough to indicate that there was neither causation nor aggravation. Again as noted above, it is not required that a medical opinion regarding secondary service connection be stated in the precise terms found in § 3.310 to be considered adequate. See Kittrell v. Shinseki, No. 08-3001, 2010 WL 4671873 (Vet. App. Nov. 10, 2010) (mem. dec., Moorman, J.). Consequently, the lack of specific reference to aggravation does not render the December 2012 VA examiner's opinion inadequate. As the Veteran's neck disability is consistent with the natural progress of aging, a reasonable inference can be made that the degenerative process affecting his neck has not been accelerated (i.e., aggravated) beyond what would be expected in an individual without osteomyelitis. For this reason, the Board finds the December 2012 examination report to be probative evidence against the Veteran's claim.

With respect to the question of whether the Veteran suffered the claimed in-service neck injury, the Board notes that the December 2012 VA examiner's opinion only relies in part on the absence of such an injury in service, as it additionally notes a lack of treatment for a chronic neck problem in service or following separation. The Board additionally notes that VA medical records include statements made by the Veteran attributing his neck pain to injuries that he received following separation. Specifically, VA medical records that are dated in August 1988 and July 1993 reflect that the Veteran initially reported having suffered a neck injury in 1987, more than two decades following separation, when he was hit on the head with a steel truck rod or rack. These statements of post-service injury were made by the Veteran when seeking medical treatment for neck pain. He made no such assertions of an in-service neck injury when he initially sought medical care post-service. The Board notes that statements made for the purpose of diagnosis or treatment "are regarded as inherently reliable because of the recognition that one seeking medical treatment is keenly aware of the necessity for being truthful in order to secure proper care." Williams v. Gov. of Virgin Islands, 271 F.Supp.2d 696, 702 (V.I.2003); see also Rucker v. Brown, 10 Vet. App. 67, 73 (1997) (ascribing heightened credibility to statements made to clinicians for the purpose of treatment).

In addition, the December 2012 VA examination report notes that the Veteran developed neck discomfort a few years ago due to the use of a protective hat at work. 

In light of the above, even accepting the Veteran's account of an in-service neck injury, the December 2012 VA examiner's opinion competently and probatively supports a finding that, even if the in-service injury were to be conceded, the in-service and post-service evidence of record supports the conclusion that the Veteran did not incur a chronic neck disability in service.

The Board further notes that the only medical opinion that supports the Veteran's claim is the Veteran's own assertion that his current neck disability is related to an in-service injury or to a service-connected disability. In the case at hand, the Veteran is competent to describe having suffered an in-service neck injury. The Board finds, however, that the question of whether the Veteran has a current neck disability that is etiologically related to an in-service injury or to a service-connected disability is of such complexity as to require that the individuals who provide competent medical evidence on this matter must possess a level of expertise that a layperson simply does not possess, especially in light of the Veteran's report at the July 1994 VA examination that he began experiencing neck problems in approximately 1982 to 1984, which is at least 15 years following his separation from service.

The Veteran has also asserted in his June 2009 substantive appeal that the "osteomyelitis I have suffered could be the cause of my spinal issues...." As discussed above, however, in the absence of evidence of an infection in the cervical spine, this article is not applicable to the Veteran's case. Furthermore, the language that is used in the article at issue (including its use of the terms "can" and "may" when discussing the relationship between osteomyelitis in one area of the body spreading to other areas) is far too speculative to support a grant of service connection. See Bostain, supra.

The Board has also considered whether service connection may be granted in the case at hand on a presumptive basis. The Veteran, however, has not contended that he has had symptoms continuously since service. 

For the reasons and bases set forth above, the Board finds that the preponderance of the evidence is against the appellant's claim of entitlement to service connection for a neck disability, to include as secondary to residuals of a left tibia injury, to include osteomyelitis. As the preponderance of the evidence is against the claim, the benefit-of-the-doubt rule does not apply, and the claim must be denied. 38 U.S.C.A. § 5107(b) (West 2002); Gilbert v. Derwinski, 1 Vet. App. 49 (1990).

C. Heart Disability

The Veteran has also claimed entitlement to service connection for a heart disability, to include as secondary to service-connected disability of the distal left tibia. The Board notes that this claim does not include that for hypertension, which will be discussed separately, below.

With respect to service treatment records, the Veteran's September 1963 enlistment examination report notes that the Veteran's heart was clinically normal on examination. He expressly denied any history of, or current, pain or pressure in chest or palpitation or pounding heart on his September 1963 pre-induction medical history report. On his June 1966 separation examination report, the Veteran's heart was clinically normal. He reported on his September 1966 statement of medical examination that his medical condition had not changed since his separation examination. Otherwise, his service treatment records reflect that he neither complained of, nor sought treatment for, symptoms that have been associated with a heart condition.

A July 1990 VA medical record notes that the Veteran has been diagnosed with left ventricular hypertrophy and sinus bradycardia. 

A December 2005 medical records include a problem list noting cardiomegaly, sinus bradycardia status post anterior ischemia status post intraventricular conduction defect (IVCD), and tortuous aorta. 

An April 2006 VA medical record includes an assessment of cardiomegaly, borderline sinus bradycardia, antero-lateral ischemia status post IVCD, and tortuous aorta. It was noted that the sinus bradycardia and anterolateral ischemia were found on electrocardiogram (EKG). 

The January 2013 VA examination report found that the Veteran has not and has never been diagnosed with a heart condition. The examiner noted that the Veteran denied ever being diagnosed with a specific heart condition but as an incidental finding in his echocardiogram (ECG) they noted abnormal septal wall motion. It was noted that the Veteran has never been diagnosed with a serious heart condition, myocardial infarction, or heart attack. She noted that the Veteran has no valvular disorders or coronary artery disease or surgeries. No serious heart conditions have been diagnosed. 

The examiner noted that the Veteran underwent an EKG in January 2013. This test showed that the Veteran had a constant cardiac arrhythmia, specifically sinus bradycardia, but it did not show hypertrophy or ischemia. A chest x-ray was normal. A 2009 ECG noted that wall motion and wall thickness were normal, and left ventricular ejection fraction (LVEF) was 60 percent. 

In terms of a current disability, the only indications of heart abnormality since the May 2006 filing of this claim are a March 2009 VA medical record's notation of left ventricular hypertrophy and sinus bradycardia and the January 2013 VA examination report's notation of sinus bradycardia. 

"Hypertrophy" is defined as "the enlargement or overgrowth of an organ or part due to an increase in size of its constituent cells." Dorland's Illustrated Medical Dictionary p. 890 (30th ed. 2003). "Ventricular hypertrophy" is defined as "hypertrophy of the myocardium of a ventricle, due to chronic pressure overload; it is manifest electrocardiographically by increased QRS complex voltage, frequently accompanied by repolarization changes." Dorland's Illustrated Medical Dictionary p. 890 (30th ed. 2003). 

"Sinus bradycardia" is defined as "a slow sinus rhythm, with a heart rate of less than 60 beats per minute in an adult; it is common in young adults and in athletes but is also a manifestation of some disorders." Dorland's Illustrated Medical Dictionary p. 246 (30th ed. 2003). 

Based on the above, the Board concludes that neither of these findings constitutes a disability for VA purposes. In making this determination, the Board is specifically relying on the January 2013 VA examiner's determination that the Veteran has not and has never been diagnosed with a heart condition. The examination report reflects that the January 2013 VA examiner's opinion was based on her review of the claims file (including the Veteran's pertinent medical history), interview of the Veteran (including the Veteran's own account of his pertinent medical history and current symptoms), and physical examination and diagnostic testing of the Veteran. The examiner was clearly aware of the findings, in particular of her own finding of sinus bradycardia, and nevertheless found that the Veteran has no history of, or current, heart disability. The Board finds that the examiner's medical expertise as a physician's assistant, her review of the claims file, and her interview and physical examination of the Veteran render her determination of no past or current heart disability highly probative.

The only other contrary opinion comes from the Veteran himself, who believes that he has a current heart disability. The Board recognizes that there are instances in which lay testimony can provide probative evidence in medical matters. See Jandreau v. Nicholson, 492 F.3d 1372 (Fed. Cir. 2007). The Board notes, however, that diagnosing a heart disability is a question of sufficient medical complexity that it requires a specialized expertise that the Veteran, as a layperson, does not possess. For this reason, the Board finds that the Veteran's opinion is of no probative value.

The Board notes that the existence of a current disability is the cornerstone of a claim for VA disability compensation. 38 U.S.C.A. §§ 1110; see also Degmetich v. Brown, 104 F.3d 1328 (1997). It is well-settled that in order to be considered for service connection, a claimant must first have a disability. In Brammer v. Derwinski, 3 Vet. App. 223 (1992), it was noted that Congress specifically limited entitlement for service-connected disease or injury to cases where such incidents resulted in disability. See also Gilpin v. Brown, 155 F.3d 1353 (Fed. Cir. 1998) (service connection may not be granted unless a current disability exists); Rabideau v. Derwinski, 2 Vet. App. 141 (1992). In the absence of a diagnosis of a current heart disability, service connection cannot be granted. 

As the preponderance of the evidence is against the Veteran's claim, the benefit-of-the-doubt doctrine does not apply, and the claim must be denied. 38 U.S.C.A. § 5107(b); Ortiz, 274 F.3d at 1364-65; Gilbert v. Derwinski, 1 Vet. App. 49 (1990). 

D. Acquired Psychiatric Disability

The Veteran has also claimed entitlement to service connection for an acquired psychiatric disability, to include as secondary to service-connected disability of the distal left tibia. 

Turning to the evidence of record, the Veteran's service treatment records reflect that he was clinically normal psychiatrically at his September 1963 enlistment and June 1966 separation examinations. He expressly denied any past or current frequent trouble sleeping, frequent or terrifying nightmares, depression or excessive worry, or nervous trouble of any sort on his September 1963 enlistment medical history report. On a September 1966 statement of medical examination, the Veteran reported that there had been no change in his medical condition since the June 1966 separation examination. 

The Veteran's service treatment records also contain a June 1965 mental hygiene consultation record diagnosing passive-aggressive personality, chronic, moderate, manifested by stubbornness and passive obstructionism. The record reflects that this evaluation was conducted at the request of the Veteran's commanding officer for clearance prior to possible administrative elimination from military service. The report notes that the Veteran had been insubordinate and that the performance of his duty is only satisfactory. Ultimately, the report recommends that there is no psychiatric contraindication to any administrative action deemed appropriate. 

In terms of post-service evidence, an August 1988 VA social assessment medical record notes that the Veteran denied any problems with anxiety or depression and denied any history of hallucination, paranoid ideation, or delusional ideation. He admitted to worrying about finances because he supports his two children. He reported that he was separated, and had asked his wife to leave their home because she had been using drugs. He had no history of mental health treatment. The psychosocial assessment notes that the Veteran was alert, oriented times three, talkative, coherent, and cooperative. He had a pleasant affect. He denied any significant psychiatric problems other than chronic sleep disturbance. He presented with possible neurological involvement. 

An October 1988 mental health clinic record notes that "no clear anxiety can be identified except 'atypical anxiety.'" A January 1989 psychiatric treatment plan record notes Axis I diagnoses of atypical anxiety and sleep disturbance complaints. A March 1989 record notes an assessment of anxiety and a history of sleeplessness. 

A June 1993 record notes an impression of anxiety. It reflects that the Veteran reported experiencing panic attacks, with his first ones having occurred in 1989. 

A July 1993 record notes that the Veteran has a history of panic attacks for the past three years. He again sought assistance with the social work service of the mental hygiene clinic in July 1993. He reported that he had had a panic attack about one month earlier. He reported feeling depressed, easily tearful. He had a head injury in 1987 and felt that severe headaches and panic attacks began after this injury. 

An August 1993 psychiatric treatment plan record notes an Axis I diagnosis of a history of panic attacks. 

An October 2008 VA mental health consultation report notes that the Veteran was referred by his primary care physician because of anxiety, panic attacks, anger, frustration, and a past history of psychiatric admission. He stated that he did not request or need the appointment, noting that he was frustrated because his home was destroyed from high water during Hurricane Ike and he was trying to work with the Federal Emergency Management Agency (FEMA) to have a mobile home put in place. It was also noted that the Veteran had hoped to stay in his current area because he can find scrap metal to sell to augment his income. He denied any unmanageable or prolonged bouts of depression, anxiety, or psychotic symptoms. He reported that he has had a series of failed, short-term relationships. 

The Veteran underwent a VA mental disorders examination in February 2013. The resulting examination report notes an Axis I diagnosis of depressive disorder not otherwise specified with features of panic attack without agoraphobia. The examiner opined that this disability was less likely than not the result of or exacerbated by his service-connected left tibia/osteomyelitis disability. The examiner noted that the Veteran was diagnosed with depressive disorder not otherwise specified in 2009, yet he has consistently denied depressive symptoms or the need for mental health treatment to manage depression both before and after this diagnosis. He noted that the diagnosis rendered in this examination is not a new diagnosis, but rather more accurately represents his current symptoms as presented during the examination. He noted that the Veteran denied any symptoms related to the tibia or neck pain. The Veteran's presentation to mental health has been for adjustment to financial hardships and loss of social relationships post natural disaster. Though the Veteran reports the occurrence of panic attacks since the 1980s, he does not meet the DSM-IV-TR criteria for panic disorder. Further, the Veteran denied experiencing panic attacks in the military, and there is no record of these attacks during service. The Veteran continues to deny persistent anxiety or worry, as well as anxiety secondary to his medical issues. The Veteran denied significant social or occupational impairments due to depression or panic. 

Based on the above, the Board finds that entitlement to service connection for an acquired psychiatric disability is not warranted, to include as secondary to service-connected osteomyelitis. The only competent medical evidence that addresses the nexus question appears in the February 2013 VA examination report. The author of this opinion is qualified through education, training, or experience to provide competent medical evidence under 38 C.F.R. § 3.159(a)(1). See Cox v. Nicholson, 20 Vet. App. 563 (2007). The examination report reflects review of the claims file and interview and physical examination of the Veteran. The examiner provided the basis for his diagnosis and for finding the diagnosed acquired psychiatric disability to be less likely than not related to service or to the Veteran's service-connected osteomyelitis. The examiner supported his opinion with a discussion of the pertinent facts of the Veteran's case. For these reasons, the Board finds the February 2013 opinion to be highly probative to the question at hand.

The Board acknowledges that the Veteran himself believes that his depression is related to his military service, to include his service-connected residuals of a left tibia injury, to include osteomyelitis. The Board recognizes that there are instances in which lay testimony can provide probative evidence in medical matters. A layperson may be competent to offer testimony on certain medical matters, such as describing symptoms observable to the naked eye, or even diagnosing simple conditions. See Jandreau v. Nicholson, 492 F.3d 1372 (Fed. Cir. 2007). The Board finds, however, that the questions posed by this claim, whether a current psychiatric disability is related to service that occurred more than 20 years prior to the first psychiatric treatment, or whether such disability is secondary to the residuals of a left tibia injury, is of such complexity as to require that the individuals who provide competent medical evidence on this matter must possess a level of expertise that a layperson simply does not possess. For these reasons, the Board finds that the Veteran's lay opinion on this question is not probative.

In addition, the Veteran has submitted an article on osteomyelitis that, as he asserts in his June 2009 substantive appeal, provides medical evidence that "suggests my service-connected osteomyelitis could affect many other issues I suffer, including those listed on this appeal." This article is not applicable to the Veteran's case, as it does not purport to make an etiological connection between the osteomyelitis infection itself and an acquired psychiatric disability. Furthermore, the language that is used in the article at issue (including its use of the terms "can" and "may" when discussing the relationship between osteomyelitis in one area of the body spreading to other areas) is far too speculative to support a grant of service connection. See Bostain, supra. In addition, there is no medical evidence of record suggesting that the Veteran suffers from psychiatric symptomatology, such as depression, as a result of the psychological effects of his osteomyelitis. Therefore, this evidence does not support the grant of service connection on a secondary basis.

With respect to the question of presumptive service connection, in the absence of a diagnosed psychosis, presumptive service connection based on the presence of a chronic disability is not available. 

In short, the Board finds that a preponderance of the evidence is against finding that the Veteran has a current acquired psychiatric disability, to include as secondary to a service-connected disability of the left distal tibia. The Board has considered the doctrine of reasonable doubt. However, as the preponderance of the evidence is against this claim, the doctrine is not for application. Gilbert v. Derwinski, 1 Vet. App. 49 (1990). Therefore, entitlement to service connection for an acquired psychiatric disability must be denied. 

ORDER

Entitlement to an increased rating for residuals of a left tibia injury, to include osteomyelitis, rated as 0 percent disabling prior to July 25, 2015, and as 20 percent disabling on and after that date, is denied.

Prior to July 25, 2015, entitlement to a rating of 10 percent, but no higher, for a scar on the distal left tibia is granted subject to the laws that govern the payment of monetary benefits.

On and after July 25, 2015, entitlement to a rating in excess of 20 percent for a scar on the distal left tibia is denied.

Entitlement to service connection for left knee arthritis, to include as secondary to a service-connected disability of the distal left tibia, is denied.

Entitlement to service connection for a cervical spine disability, to include as secondary to a service-connected disability of the distal left tibia, is denied.

Entitlement to service connection for a heart disability, to include as secondary to a service-connected disability of the distal left tibia, is denied.

Entitlement to service connection for hypertension, to include as secondary to a service-connected disability of the distal left tibia, is denied.

Entitlement to service connection for an acquired psychiatric disability, to include as secondary to a service-connected disability of the distal left tibia, is denied.

REMAND

The Veteran has also claimed entitlement to service connection for a lumbar spine disability, to include as secondary to his service-connected residuals of a left tibia injury. Even though VA has already obtained an etiology opinion in this case, the Board finds it necessary to remand this issue in order to obtain an opinion that addresses a specific contention the Veteran has made.

Specifically, on his February 2013 VA Form 9, substantive appeal, the Veteran noted that his left leg is shorter than his right leg. (The March 2009 VA examination report corroborates this assertion, noting that the Veteran's left leg is one centimeter shorter than his right leg.) The Veteran noted that this discrepancy has changed his gait over the course of years and has resulted in low back problems. The Board finds it necessary to remand this claim in order to obtain an etiology opinion on whether the residuals of the Veteran's left tibia injury, specifically his shortened left leg, have caused or aggravated a current back disability.

The Veteran has also claimed entitlement to service connection for hypertension, to include as secondary to service-connected disability of the distal left tibia. 

The January 2013 VA examination report notes that the Veteran does have a history of poorly controlled hypertension that is currently controlled with medication. It was noted that the Veteran was diagnosed with hypertension but that the date of diagnosis was unknown. It was noted that the Veteran reported a history of hypertension since the 1980s. The examiner opined that the Veteran's hypertension was less likely than not incurred in or caused by the claimed in-service injury, event, or illness. Her rationale was that the Veteran had no report or evidence of hypertension or heart condition in service. When the Veteran left service, his blood pressure was 120/76 in June 1966. 

The examiner also opined that the Veteran's claimed condition is less likely than not proximately due to or the result of his service-connected osteomyelitis. In her rationale, she noted that infection does not cause heart disease or hypertension. The examiner noted that the Veteran reports the medication he took 50 years ago for pain in his leg caused his hypertension and heart condition. She noted that the medication was Darvon. She noted that studies indicated that a very small percentage of people who were using this medication suffered sudden death or stroke. The Veteran has not had the medication in many years and it did not cause sudden death or stroke, as he has never had this. It never caused hypertension. Addition, the examiner noted, the risk is gone after discontinuation of the medications. As the medications have not been around in many years, hypertension and heart condition are not a result of use of Darvon in service. Hypertension was never found to be associated with the medications or his condition. 

The Board finds that while the VA examiner clearly found no causal relationship between the Veteran's hypertension and service-connected osteomyelitis, including medication taken to treat the service connected disability, it is unclear that the rationale covers aggravation. Accordingly, an addendum opinion must be obtained. 

Lastly, the record reflects that the Veteran's VA medical records were last obtained in November 2015. While this case is on remand, the AOJ should obtain the Veteran's VA medical records from November 2015 to the present.

Accordingly, the case is REMANDED for the following action:

1. Obtain any outstanding VA medical records (including any that were created after VA last obtained the Veteran's records in November 2015) and associate these records with the claims file. 

2. Following completion of the above, arrange for the Veteran to undergo an examination by a qualified examiner to determine whether the Veteran has a current low back disability that was caused or aggravated by his leg length discrepancy. The claims file must be thoroughly reviewed by the examiner in connection with the examination, and a complete history should be elicited directly from the Veteran. Any tests and studies deemed necessary by the examiner should be conducted. All findings should be reported in detail. 

The examiner should opine whether it is at least as likely as not (50 percent probability or more) that any low back disability was caused by or aggravated as a result of his leg length discrepancy. Specifically, the claims file indicates that the Veteran's left leg is one centimeter shorter than his right leg, and this is indicated to be a residual of the service-connected injury to the left tibia. Please address the contention that this leg length discrepancy resulted in an altered gait which, in turn, either caused or aggravated a low back disability. 

In this context, "aggravation" has occurred when it has been medically determined that a low back disability has undergone an identifiable permanent increase in its severity that is proximately due to or the result of any residual of the Veteran's left tibia injury, to include leg length discrepancy.

If aggravation is shown, the examiner should quantify the degree of aggravation, if possible.

A complete rationale for any opinion is required. If it is not possible to provide the requested opinion without resort to speculation, the examiner should state why speculation would be required in this case, e.g., if the requested determination is beyond the scope of current medical knowledge, actual causation cannot be selected from multiple potential causes, etc. If there are insufficient facts or data within the claims file, the examiner should identify the relevant testing, specialist's opinion, or other information needed to provide the requested opinion.

3. Obtain an addendum opinion to the January 2013 VA hypertension examination report that addresses aggravation. The examiner should opine whether it is at least as likely as not (50 percent probability or more) that the Veteran's hypertension was AGGRAVATED by his service connected residuals of a left tibia injury, to include osteomyelitis, to include medications taken to treat the disability. If aggravation is shown, the examiner should quantify the degree of aggravation, if possible. Please provide a rationale. 

4. After the development requested above has been completed, readjudicate the issues on appeal. If any benefit sought on appeal remains denied, the appellant and his representative should be furnished a supplemental statement of the case and given the opportunity to respond thereto. Thereafter, the case should be returned to the Board, if in order.

The appellant has the right to submit additional evidence and argument on the matter or matters the Board has remanded. Kutscherousky v. West, 12 Vet. App. 369 (1999).

 (CONTINUED ON NEXT PAGE)

This claim must be afforded expeditious treatment. The law requires that all claims that are remanded by the Board of Veterans' Appeals or by the United States Court of Appeals for Veterans Claims for additional development or other appropriate action must be handled in an expeditious manner. See 38 U.S.C.A. §§ 5109B, 7112 (West 2014).

______________________________________________
TANYA SMITH
Veterans Law Judge, Board of Veterans' Appeals

Department of Veterans Affairs